

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

_____

## No. 06-09-00013-CV
_____

## IN THE INTEREST OF R.A.L., A CHILD

On Appeal from the 62nd Judicial District Court
Lamar County, Texas
Trial Court No. 77294

Before Morriss, C.J., Carter and Moseley, JJ.
Opinion by Justice Moseley

O P I N I O N

After a trial to a jury, the parental rights between John and Mary and their biological son, Absalom,[1] were terminated. The termination action was not instituted by any State agency but, rather, by Mrs. Smith (Mary's mother) and her husband, Mr. Smith (Mary's stepfather), as a predicate to an action for adoption. John and Mary each appeal from this order, alleging that the evidence was legally and factually insufficient to support termination and that they received ineffective assistance of counsel in this private termination suit. They further urge that the trial court erred in erroneously admitting hearsay evidence and in failing to submit a requested jury charge. We affirm.

## I.    Factual and Procedural Background

Kevin Jenkins, an investigator with the Lamar County Sheriff's Department, found twenty-five grams of methamphetamine in the home of John and Mary. At the time the drugs were found, Absalom, who was approximately three months old at the time, was residing in the home with them. The Department of Family and Protective Services (DFPS) arranged for the child to stay with Mrs. Smith. John and Mary did not participate in DFPS's services and family plan. As a result, in 2006, Mr. and Mrs. Smith obtained sole custody of the child and neither John nor Mary were granted court-ordered visitation rights.

---

[1]The use of initials in lieu of names and acronyms for the names of agencies in this case makes for an alphabet soup which is both confusing and difficult to follow. Accordingly, aliases are employed for all of the individuals who are parties.

On May 20, 2008, Mr. and Mrs. Smith filed a joint petition wherein they sought termination of the parental rights of John and Mary and, following that, the adoption of Absalom. The sought-for termination was based on Section 161.001(1)(Q) of the Texas Family Code, which allows for termination if the parents have been convicted of an offense and are unable to care for a child due to imprisonment for at least two years from the date that the petition is filed. TEX. FAM. CODE ANN. § 161.001(1)(Q) (Vernon 2008). A jury heard testimony of both natural parents' troubled past.

John had been incarcerated twelve times during his lifetime, having had a laundry list of convictions: driving while intoxicated, possession of marihuana, burglary, resisting arrest, theft of stolen property, and theft of check. He had also been using methamphetamine when it was found in his home. After John and Mary were released from jail on bond, they broke into Mr. and Mrs. Smiths' home (where Absalom was then living), where they stole items from the house, stole the Smiths' car, and fled to Mexico, where they were later arrested. On April 12, 2007, John entered pleas of guilty to possession of methamphetamine (receiving a ten-year sentence), to the burglary of the Smith home (receiving an eight-year sentence to run concurrently with the possession conviction), and to forgery (receiving a twelve-year sentence, also to run concurrently). Because he had also counterfeited money, a federal detainer had been issued, this federal detainer requiring him to serve a thirty-seven-month sentence.[2]

---

[2]John testified that the federal detainer sentence was to run concurrently with the other sentences entered on April 12, 2007. However, the language of the detainer conflicts with his testimony.

3

Mary's history was likewise fairly sordid. She was forced to quit a previous job at a pharmacy because she was discovered taking patients' prescription medications. After receiving community supervision for forgery and burglary and while living with John, she attempted to pass counterfeit money which she printed. As with the circumstance of John, Mary also was abusing drugs at the time methamphetamine was found in their home. As stated before, she participated with John in the burglary of the Smith home and the theft of their automobile, thereafter fleeing to Mexico; she had stolen Mrs. Smith's checkbook and was masquerading as Mrs. Smith when she was arrested. In addition to the burglary of the home of the Smiths, without John's participation, she broke into her aunt's home, stole everything of value and anything which could be used to forge checks.[3] She then passed forged checks in Texarkana and in Eagle Pass. In 2007, Mary was found guilty[4] of the following crimes which resulted in the following concurrent sentences: 1) possession of methamphetamine with intent to distribute (receiving a sentence of seven years); 2) forgery (a twelve-month sentence); 3) burglary of the Smiths' home (a five-year sentence); and 4) burglary of Mary's aunt's home (a five-year sentence). Because she had also counterfeited money, a federal detainer had been issued, requiring her to serve a twenty-seven-month sentence.

---

[3]The aunt's home burned down the day Mary burglarized it, but Mary denied involvement.

[4]The record is unclear whether these findings of guilt were the result of guilty pleas or trials.

4

## II. Analysis

### 1. Legally and Factually Sufficient Evidence Supported Termination of Parental Rights

#### a. Section 161.001(1) Requirements

"Rights which inhere in the parent-child relationship are of constitutional dimension." *In re J.J.*, 911 S.W.2d 437, 439 (Tex. App.—Texarkana 1995, writ denied). Because of the involuntary nature of this termination proceeding, it must be strictly scrutinized. *Id.*

A trial court may order termination of the parent-child relationship if it finds by clear and convincing evidence that termination is in the best interest of the child, and the parent has "knowingly engaged in criminal conduct that has resulted in the parent's: (i) conviction of an offense; and (ii) confinement or imprisonment and inability to care for the child for not less than two years from the date of filing the petition." TEX. FAM. CODE ANN. § 161.001(1)(Q), (2) (Vernon 2008). The statute's two-year time period is to be applied prospectively. *In re A.V.*, 113 S.W.3d 355, 356 (Tex. 2003). Although we recognize the grave reality that the "'termination suit can result in a parent's loss of his or her legal relationship with the child,' the primary focus is protecting the best interests of the child." *Id.* at 361. The requirement that evidence supporting a termination order be clear and convincing "is both constitutionally as well as statutorily mandated." *J.J.*, 911 S.W.2d at 439.

The clear and convincing standard of proof required at the trial court level necessarily affects our appellate review of the evidence. *In re J.F.C.*, 96 S.W.3d 256, 265 (Tex. 2002). In reviewing

5

legal sufficiency, we reject the traditional standard which only requires anything more than a scintilla of evidence. *Id.* Instead, we look at all the evidence in the light most favorable to the judgment to determine if the jury could reasonably have formed a firm belief or conviction that grounds for termination existed under the Texas Family Code. *Id.* at 266. To give appropriate deference to the jury's conclusions when conducting a legal sufficiency review, we must assume that it resolved disputed facts in favor of its finding if a reasonable jury could do so. *Id*.

When we review termination findings for factual sufficiency, we must give due deference to a jury's fact-findings, and must not supplant its judgment with our own. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006) (citing *Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 761 (Tex. 2003); *In re C.H.*, 89 S.W.3d 17, 27 (Tex. 2002)). We consider only evidence that the jury could reasonably have found to be clear and convincing and inquire "whether the evidence is such that a factfinder could reasonably form a firm belief or conviction about the truth of the . . . allegations." *H.R.M.*, 209 S.W.3d at 108; *J.F.C.*, 96 S.W.3d at 266. In applying this standard in light of the "clear and convincing" language required by Section 161.001, we must be careful not to "be so rigorous that the only factfindings that could withstand review are those established beyond a reasonable doubt." *H.R.M.*, 209 S.W.3d at 108.

Despite John's and Mary's extensive history with the criminal justice system, they are optimistic of the possibility of parole, and they question whether the evidence is sufficient to establish that they will be incarcerated and unable to take care of Absalom until May 20, 2010. The

6

jury heard that John was eligible to be considered for parole for the third time in July 2009. Because he was not convicted of an aggravated crime and had not received any disciplinary reprimand since incarceration, John stated that he expected to be paroled, even though he had never been out on parole during any of his twelve incarcerations. John emphasized that he completed self-help classes, Bible study class, a forty-day Purpose Driven Life course, a ten-week anger solution course, a twelve-step substance abuse program, a Strategies and Success program, was enrolled in a Basic Life Principles program and a Celebrate Recovery program, earned his GED, and had become certified as a peer health educator. Similarly, Mary testified that she was involved in a Christians against substance abuse program, Bible study, and parenting, cognitive, and victim impact classes. When released, Mary hoped to re-establish an amicable relationship with the Smiths, attend college, and get a degree in substance abuse counseling.

While John's sister and brother-in-law testified they were prepared to help John and Mary upon their respective releases by providing them with a place to live and a job in the family business, Mary testified, "I'm asking, you know, at least give me a year, maybe two years, to get out and get things together." Mrs. Smith testified that she was not aware if John had ever been employed in any job. Mr. Smith claimed that he and his wife had done everything to help John and Mary, but their efforts had been to no avail.

*H.R.M.* correctly pointed out that in some cases, neither the length of the sentence nor the projected release date was dispositive of the actual release date of the parent due to possibility of

parole. 209 S.W.3d at 108–09. However, the Texas Supreme Court also stated that while evidence of availability of parole is relevant, its mere introduction "does not prevent a factfinder from forming a firm conviction or belief that the parent will remain incarcerated for at least two years," because "[p]arole decisions are inherently speculative." *Id.* at 109. Thus, as "'the sole arbiter when assessing the credibility and demeanor of witnesses' . . . [a] jury [is] free to disregard [parole's] testimony, which [is] barely more than conjecture," especially when a record shows multiple convictions and sentences, and previous denials of parole. *Id.*

Since John had already been twice denied parole, and since Mary had also been denied parole, the jury was free to disregard the parents' optimistic testimony. Reviewing the evidence, we conclude the jury could have formed a clear and convincing belief that both parents would be incarcerated until May 20, 2010, and that they would be unable to support or care for the child during that period. Thus, it can be determined that there was sufficient evidence for the jury to have found that the requirements of Section 161.001(1)(Q) were met.

**b.      The Best Interest of the Child Requirement**

A nonexhaustive list of factors that can be used in determining the best interest of the child in a termination case include: 1) the emotional and physical needs of the child now and in the future; 2) the parental abilities of individuals seeking custody; 3) the plans for the child by individuals seeking custody; 4) the stability of the home or proposed placement; 5) the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one; and 6) any

8

excuse for the acts or omissions of the parent. *In re S.B.*, 207 S.W.3d 877, 886 (Tex. App.—Fort Worth 2006, no pet.). Further, evidence offered to prove grounds for termination, the degree of contact between the natural parent and child, degree of financial support, quality of care rendered by a child's caregiver, and their willingness to adopt are all relevant to determining if the termination is in the best interest of the child. *In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002); *In re J.W.M.*, 153 S.W.3d 541, 548–49 (Tex. App.—Amarillo 2004, pet. denied) ("While the prospect of adoption into a stable home cannot alone be said to be a determinative factor, it clearly is among the factors the court properly could consider . . . .").

Mr. and Mrs. Smith, June Compost-Tyler (a worker with the DFPS), Gary Marlowe (who had been appointed by the trial court to conduct a social study regarding adoption placement), and Mary's biological father and aunt all recommended that termination of parental rights was in the best interest of Absalom. John, Mary, and John's sister and brother-in-law each opposed the termination.

Absalom had been in custody of the Smiths since he was three or four months old. The jury heard testimony that the Smiths provided a stable home environment where Absalom was well taken care of and was happy. Mary testified that while John had sired six children, he only had a relationship with three. John had not seen Absalom since the Smiths assumed custody in 2006, and none of John's other children had ever had contact with Absalom. Although Mary testified that she did not visit Absalom often, Mrs. Smith clarified that Mary did not visit the child at all, even though she was not incarcerated until four months after the Smiths assumed custody of the child. Mary

9

admitted that if she were to meet the child, the child would not recognize her. The Smiths and Mary's aunt all confirmed that Absalom would not recognize either of his biological parents and that he believed the Smiths were his parents.

There is no doubt that the emotional and physical needs of the three-year-old child were great and that those needs would grow through time. A plethora of evidence was developed demonstrating that the Smiths could provide for Absalom's parental and financial needs. In contrast, there was no evidence demonstrating how John and Mary could fulfill the child's need for caring parents, even if there was some evidence of possible ways that they could eventually support the child financially. The Smiths maintained a stable home where Absalom was happy, while John and Mary had open invitations from John's family that they could reside in their homes once their stays in prison had been completed. The acts and omissions of the biological parents (not only in their past criminal behavior, but in their lack of interaction with the child) indicated that the existing parent-child relationship was not a proper one for the child. It was uncontested that the child believed Mr. and Mrs. Smith to be his parents and that he simply did not know John or Mary.

Giving appropriate deference to the jury, we find it could have formed a firm belief or conviction that proper Texas Family Code grounds for termination existed and that it was in Absalom's best interest that the parental rights be terminated, even if the jurors only considered evidence that was clear and convincing in arriving at that determination. Thus, we conclude the evidence was both legally and factually sufficient to support the trial court's termination order.

10

## 2. Effective Assistance of Counsel

Next, John and Mary argue that their trial counsel provided ineffective assistance as guaranteed by the Sixth Amendment. When the Texas Supreme Court was first presented with this issue, they declined to specifically address it and specifically opted to "leave open" that question. *J.F.C.*, 96 S.W.3d at 281. Instead, the court discussed the two-prong *Strickland*[5] test, saying:

> A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components. First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

*Id.* at 280. The court then went straight to a harm analysis and concluded that even if right to effective assistance was guaranteed, the parents in that case whose parental rights were terminated could not prove that a different result would ensue (i.e., that the court would not have terminated parental rights). *Id.* at 281.

More recently, in *In re M.S.*, the Texas Supreme Court concluded that Section 107.013 of the Texas Family Code provided a statutory right to effective counsel in parental-rights termination cases where suit was filed by a governmental entity and the parent was indigent. 115 S.W.3d 534 (Tex. 2003). Since *M.S.*, it has been reiterated that "[i]t is well established that the right to effective assistance of counsel does not extend to purely civil cases." *Sanchez v. Sanchez*, No. 04-06-00469-

---

[5]*Strickland v. Washington*, 466 U.S. 668 (1984).

11

CV, 2007 WL 1888343, at *5 (Tex. App.—San Antonio July 3, 2007, pet. denied) (mem. op.) (dealing with child custody). Our sister courts have expressly held that no "right exists to appointed counsel in a private termination suit." *In re J.C.*, 250 S.W.3d 486, 489 (Tex. App.—Fort Worth 2008, pet. denied); *see Brothers v. West*, No. 2-08-202-CV, 2009 WL 1270652, at *3 (Tex. App.—Fort Worth May 7, 2009, no pet. h.) (mem. op.); *see also In re T.L.B.*, No. 07-07-0349-CV, 2008 WL 5245905, at *1 (Tex. App.—Amarillo Dec. 17, 2008, no pet.) (mem. op.).[6]

However, we need not resolve the issue of whether effective assistance was constitutionally required in this case since John and Mary do not meet the *Strickland* test for ineffective assistance claims as cited in *J.F.C.* 96 S.W.3d at 280 (citing *Strickland*, 466 U.S. 668). Failure to satisfy either prong of the *Strickland* test is fatal and we need not examine both *Strickland* prongs if one cannot be met. *Strickland*, 466 U.S. at 697; *Jaubert v. State*, 74 S.W.3d 1, 9 (Tex. Crim. App. 2002). The second prong of *Strickland* would require John and Mary to demonstrate that counsel's errors had some conceivable effect on the outcome of the proceeding such that its result would have been different. 466 U.S. at 693. Because, as discussed above, the unobjectionable evidence was otherwise sufficient to support the judgment, John and Mary would not be able to meet this standard to establish harm, even assuming its application.

---

[6]We note that *M.S.* only concluded that Section 107.013 of the Texas Family Code provided a statutory right to effective counsel in parental-rights termination cases where suit was filed by a governmental entity and the parent was indigent. 115 S.W.3d 534; *see* TEX. FAM. CODE ANN. § 107.013 (Vernon 2008).

12

### 3. Admission of Federal Detainers Did Not Result in Reversible Error

John and Mary argue that the trial court erred in admitting the federal detainers against them, since the documents constituted hearsay. The admission or exclusion of evidence is a matter within the sound discretion of the trial court. Thus, we review this issue under an abuse of discretion standard. *Daniels v. Yancey*, 175 S.W.3d 889, 895 (Tex. App.—Texarkana 2005, no pet.) (citing *City of Brownsville v. Alvarado*, 897 S.W.2d 750, 753 (Tex. 1995)).

To reverse a judgment based upon error in the admission or exclusion of evidence, the appellant must show that the trial court committed error and that the error was reasonably calculated to cause and probably did cause rendition of an improper judgment. TEX. R. APP. P. 44.1(a)(1); *McCraw v. Maris*, 828 S.W.2d 756, 757 (Tex. 1992). In making this determination, we must review the entire record.

When Mary was being questioned, the following exchange occurred:

> Q. This is a detainer that was given to Lamar County that says once you finish your charges here that you will receive a 24 month sentence in the Federal Penitentiary?
>
> A. Yes, sir.

There was no objection to this testimony. When the detainer was offered into evidence, Mary's counsel objected because the detainer was "not certified or verified; so therefore, it would be hearsay." The trial court overruled the objection after it was pointed out that Mary had verified the detainer. During subsequent questioning, the contents of the detainer was read by Mary without

13

objection. Mary stated, "Prior to the subject[']s release from your custody, please notify this office at once so that we may assume custody of the suspect for [her] service of Federal sentence of imprisonment." This same pattern of testimony was developed for John's federal detainer, although he (unlike Mary) did not read the contents of the detainer into the record.

We note that both John and Mary admitted that the information in the federal detainer was correct. Nevertheless, assuming arguendo that admission of the federal detainers was erroneous, any such error would not have been harmful since it was cumulative of unobjected-to statements made by John and Mary. *See Anderson v. State*, 717 S.W.2d 622, 627 (Tex. Crim. App. 1986); *Cunningham v. State*, No. 06-03-00094-CR, 2004 WL 2070816, at *7 (Tex. App.—Texarkana Sept. 17, 2004, pet. ref'd) (not designated for publication).

### 4. Counsel Failed to Preserve Alleged Error Regarding Jury Charge Instruction

John and Mary next argue that the trial court abused its discretion in failing to instruct the jury that incarceration alone is not sufficient to support termination of parental rights. The record does not demonstrate that John or Mary requested any such instruction. The court's charge utilized the exact statutory wording for termination cases as required by Section 161.001(1)(Q) of the Texas Family Code. During the charge conference, John and Mary objected by merely stating that incarceration alone is insufficient to support termination, a fact pointed out by the statutory conjunctive wording requiring "confinement or imprisonment *and* inability to care for the child for not less than two years from the date of filing the petition." (Emphasis added.) "A request by either

14

party for any questions, definitions, or instructions shall be made separate and apart from such party's objections to the court's charge." TEX. R. CIV. P. 273. We decline to interpret the above objection as a request for instruction. Even if we did decide this was an oral request for an omitted instruction, no such error would have been preserved since counsel failed to submit a written instruction to the trial court. *Id.*; *Gragson v. M.E.&E. Welding & Fabrication, Inc.*, No 06-00-00044-CV, 2001 WL 1190087, at *7 (Tex. App.—Texarkana Oct. 10, 2001, pet. denied).

### 5.     Trial Court Did Not Abuse Discretion in Denying Continuance

Finally, John argues that he was not able to prepare a defense because the trial court denied his second motion for continuance, which was filed on the day of trial. Specifically, John complains that he did not have contact with his court-appointed attorney until October 17, 2008, and was unable to contact witnesses who could testify in his favor. We review the trial court's ruling on John's motion for continuance for an abuse of discretion. *R.M. Dudley Constr. Co. v. Dawson*, 258 S.W.3d 694, 701 (Tex. App.—Waco 2008, pet. denied) (citing *Villegas v. Carter*, 711 S.W.2d 624, 626 (Tex. 1986)).

An application for continuance may only be granted for sufficient cause supported by affidavit, consent of the parties, or operation of law. TEX. R. CIV. P. 251. Since the ground for the motion was the want of testimony, John was required to file an affidavit demonstrating that the testimony would be material, that he "used due diligence to procure such testimony, stating such diligence, . . . that such testimony [could] not be procured from any other source." TEX. R. CIV. P.

15

252.  It was also necessary for John to "state the name and residence of the witness, and what he expect[ed] to prove by him; and also state that the continuance [was] not sought for delay only, but that justice may be done."  TEX. R. CIV. P. 252.

The record confirms that John had knowledge as of May 30, 2008, that the termination suit had been instituted.  The motion for continuance (which is not supported by affidavit) demonstrates that John knew by October 17, 2008, of the appointment of counsel and that he also knew that a final hearing had been set for December 1, 2008.  While the motion states that John had mailed letters to potential witnesses on November 20, 2008, it fails to list the names of any such potential witnesses nor does it indicate anything of the content of their anticipated testimony.  Thus, the motion for continuance wholly failed to comply with Rules 251 and 252 of the Texas Rules of Civil Procedure; its ineffectiveness was further compounded by the fact that it was filed on the day of trial, after conclusion of the court's pretrial conference.  *Villegas*, 711 S.W.2d at 626 ("Generally, when movants fail to comply with [Rule] 251's requirement that the motion for continuance be 'supported by affidavit,' we presume that the trial court did not abuse its discretion in denying the motion"); *Gonzales v. State*, No. 07-07-00036-CR, 2009 WL 498032, at *2 (Tex. App.—Amarillo Feb. 27, 2009, pet. filed) (mem. op.) (trial court did not abuse discretion in denying motion for continuance filed on day of trial); *R.M. Dudley Constr. Co.*, 258 S.W.3d at 701 (same).  Based on these circumstances, we cannot say the trial court abused its discretion in denying the motion for continuance.  John and Mary's final point of error is overruled.

16

### III.     Conclusion

We affirm the trial court's judgment terminating the parental rights of John and Mary.


Bailey C. Moseley
Justice

Date Submitted:     July 2, 2009
Date Decided:       July 9, 2009