ACCEPTED
12-14-00210CR
TWELFTH COURT OF APPEALS
TYLER, TEXAS
6/3/2015 6:20:55 PM
CATHY LUSK
CLERK

No. 12-14-00210-CR

_____

IN THE COURT OF APPEALS OF TEXAS
FOR THE TWELFTH CIRCUIT
TYLER, TEXAS

_____

RECEIVED IN
12th COURT OF APPEALS
TYLER, TEXAS

6/3/2015 6:20:55 PM

CATHY S. LUSK
Clerk

FILED

6-3-2015

Twelfth Court of Appeals
Cathy Lusk
Clerk

*BOBBIE GRUBBS*
Appellant

v.

*STATE OF TEXAS*
Appellee

_____

On Appeal From Cause No. 14-CR-19074
In the 273RD Judicial District Court of Shelby County, Texas

---

APPELLANT BOBBIE GRUBBS' BRIEF

---

LAW OFFICE OF STEPHEN SHIRES PLLC
Attorney & Counselor at Law

W. Stephen Shires
State Bar No. 50511894
123 San Augustine Street
Center, Texas 75935
(936) 598-3052 (Phone)
(936) 598-3031 (Facsimile)

**ATTORNEY FOR BOBBIE GRUBBS**

# IDENTITY OF PARTIES AND COUNSEL

In accordance with TEX. R. APP. P. 38.1(a), the following is a list of the parties to this action, their respective counsel, and the presiding judge at trial:

| | |
|---|---|
| <u>Appellant:</u> | Mr. Bobbie Grubbs ("Grubbs") |
| <u>Appellant's Trial Counsel:</u> | Mr. John R. Smith<br>Law Office of John R. Smith<br>P.O. Box 2020<br>Center, Texas 75935<br>(936) 598-2744 |
| | Robert A. Goodwin<br>Attorney at Law<br>325 West Sabine Street, Suite D<br>Carthage, Texas 75633<br>(936) 591-7375 |
| <u>Appellant's Appellate Counsel:</u> | Mr. W. Stephen Shires<br>The Law Office of Stephen Shires PLLC<br>123 San Augustine Street<br>Center, Texas 75935<br>(936) 598-3052 |
| | Robert A. Goodwin<br>Attorney at Law<br>325 West Sabine Street, Suite D<br>Carthage, Texas 75633<br>(936) 591-7375 |
| <u>Appellee:</u> | The State of Texas ("State") |
| <u>Appellee's Trial and Appellate Counsel:</u> | Mr. Ralph Guerrero (Special Prosecutor)<br>Mr. Wesley Mau (Special Prosecutor)<br>Mr. Kenneth Florence<br>Shelby County District Attorney<br>200 San Augustine Street<br>Center, Texas 75935<br>(936) 598-2489 |
| <u>Trial Judge:</u> | Honorable Charles R. Mitchell |

# TABLE OF CONTENTS

IDENTITY OF PARTIES AND COUNSEL ......................................................... ii

TABLE OF CONTENTS ................................................................................ iii

TABLE OF AUTHORITIES ............................................................................iv

STATEMENT REGARDING ORAL ARGUMENT .................................................1

REFERENCES TO THE RECORD ....................................................................1

STATEMENT OF ISSUES ...............................................................................1

STATEMENT OF THE CASE...........................................................................2

STATEMENT OF FACTS ................................................................................3

SUMMARY OF THE ARGUMENT .................................................................11

ARGUMENT ..............................................................................................12

A. *The trial court committed error when it failed to grant a mistrial, or in the very least exclude the statement, when the State played an incorrect DVD at trial that contained an admission from Defendant in the statement that had been previously ruled by agreement as inadmissible.*................................12

B. *The trial court committed error by failing to include a definition and instruction on "involuntary intoxication" and its consequences* .........................................17

C. *The trial court committed error by not suppressing the statements made by Grubbs to Montgomery County Sheriff Detective Keith Echols at the Montgomery County Sheriff's Office*................................................................21

D. *The trial court committed error by not suppressing the statements made by Grubbs to DPS Trooper Sean Barnes while being transported to the Montgomery County Sheriff's Office* .................................................................24

CONCLUSION AND PRAYER ......................................................................26

CERTIFICATE OF SERVICE ........................................................................27

CERTIFICATE OF WORD COUNT COMPLIANCE..........................................27

# TABLE OF AUTHORITIES

## CASES

*Alexander v. State*, 2002 WL 436993 (Tex. App. – Austin 2002) ............... 19

*Arizona v. Fulminante,* 499 U.S. 279, 285–86 (1991)................................. 22

*Bauder v. State*, 921 S.W.2d 696, 698 (Tex.Crim.App.1996)...................... 16

*Brazzell v. State,* 481 S.W.2d 130 (Tex.Crim.App.1972) ........................... 14

*City of Brownsville v. Alvarado,* 897 S.W.2d 750 (Tex.1995).................... 14

*Coble v. State*, 330 S.W.3d 253, 292 (Tex.Crim.App.2010) ........................ 16

*Delao v. State,* 235 S.W.3d 235, 239 (Tex.Crim.App.2007) ....................... 22

*Elkins v. State*, 647 S.W.2d 663 (Tex. Crim. App. 1983) ........................... 15

*Giesberg v. State*, 984 S.W.2d 245 (Tex. Crim. App. 1998)........................ 19

*Hernandez v. State*, 805 S.W.2d 409, 413 (Tex.Crim.App.1990) ................ 16

*In re R.A.L.,* 291 S.W.3d 438 (Tex.App.-Texarkana 2009, no pet.)............. 14

*McCraw v. Maris,* 828 S.W.2d 756 (Tex.1992)) .......................................... 14

*Mercedes–Benz Credit Corp. v. Rhyne,* 925 S.W.2d 664 (Tex.1996).......... 14

*Oursbourn v. State,* 259 S.W.3d 159 (Tex.Crim.App.2008) ...... 21, 22, 23,26

*Ramos v. State,* 245 S.W.3d 410, 418 (Tex.Crim.App.2008)....................... 22

*Torres v. State*, 585 S.W.2d 746, 749 (Tex. Crim. App. 1979).............. 19, 20

## STATUTES AND RULES

TEX. CODE CRIM. PROC. Art. 38.21 ............................................................. 21

TEX. CODE CRIM. PROC. Art. 38.22 ............................................................. 21

TEX. PENAL CODE Ann. §8.04 ..................................................................... 20

TEX. R. EVID. 404(b) ................................................................................... 14

## OTHER SOURCES

Goode Wellborne & Sharlot, *Texas Practice, Guide to the Rules of Evidence*, Vol. 1 (Thompson Reuters 2015)................................................ 15

## STATEMENT REGARDING ORAL ARGUMENT

Appellant Grubbs requests oral argument in this case. Oral argument would be of benefit to the Court as this case presents important issues of substantive law and an unusual set of facts.

## REFERENCES TO THE RECORD

*Clerk's Record:* There are two (2) Volumes of the Clerk's Record. All references to the Clerk's record will be made in the following fashion: v CR p, where v represents the volume of the record and p represents the page number found in same.

*Reporter's Record:* There are fifteen (15) Volumes of the Reporter's Record. All references to the Clerk's record will be made in the following fashion: v RR p, where v represents the volume of the record and p represents the page number found in same.

## STATEMENT OF ISSUES

1. Did the trial court err when it failed to grant a mistrial, or in the very least exclude the statement, when the State played an incorrect DVD at trial that contained an admission from Defendant in the statement that had been previously ruled by agreement as inadmissible?

2. Did the trial court err in failing to include a definition and instruction on "involuntary intoxication" and its consequences?

3. Did the trial court err in not suppressing the statements made by Grubbs to Montgomery County Sheriff Detective Keith Echols made at the Montgomery County Sheriff's Office?

4. Did the trial court err in not suppressing the statements made by Grubbs to DPS Trooper Sean Barnes while Grubbs was being transported to the Montgomery County Sheriff's Office?

## STATEMENT OF THE CASE

On September 25, 2012, Grubbs was indicted for Capital Murder in Cause Number 12-CR-18608. 1 CR 9. On February 19, 2014, Grubbs was re-indicted in Cause Number 14CR-19074, on one count of Capital Murder and two counts of Aggravated Assault. 1 CR 27-28. On March 4, 2014, the State filed a motion to transfer the pleadings from Cause Number 12-CR-18608 to Cause Number 14CR-19074. 1 CR 23. The Court granted the State's Motion on March 21, 2014. 1 CR 25. On that same day, the Court dismissed Cause Number 12-CR-18608. 1 CR 26. On February 21, 2014, the Court ordered that Grubbs be tested for insanity and incapacity. 1 CR 29-32. Thereafter, Edward B. Gripon, M.D. P.A., filed an initial report on those issues on March 25, 2014 (1 CR 50-60), and a subsequent report on May 1, 2014 (1 CR 177-183).

On May 13, 2014, the trial of this case commenced. 5 RR 1. On May 19, 2014, the jury found Grubbs guilty of one count of Capital Murder and two counts of Aggravated Assault. 9 RR 141-142. On May 19, 2012, the Court sentenced Grubbs to confinement in the Institutional Division of the Department of Criminal Justice for life without the opportunity of parole on the Capital Murder charge, and

confinement in the Institutional Division of the Department of Criminal Justice for life on each of the two aggravated assault charges. 5 RR 150.

On May 20, 2014, Grubbs filed a Motion for New Trial. 2 CR 263-264. The Motion was overruled as a matter of law. On July 23, 2014, Grubbs timely filed his Notice of Appeal. 2 CR 290. Grubbs now files his Appellant's Brief.

## STATEMENT OF FACTS

The State accuses Grubbs of committing capital murder and two aggravated assaults arising from an incident at the Joaquin Country Inn ("Country Inn") in Joaquin, Texas on April 27, 2012. 5 RR 16. The State alleges that Grubbs and his wife, Deedra Grubbs ("Deedra"), fled Montgomery County, Texas, on April 26, 2012, after they had robbed Mary Jane Cashdollar ("Cashdollar") in her home. 5 RR 16-17. Cashdollar had previously employed Deedra to clean her house, which is located in Spring, Texas. 5 RR 17. The State asserts that Grubbs and Deedra made their way north from Conroe, up through Nacogdoches, heading for Louisiana, when they began having car trouble. 5 RR 18. The State alleges that Grubbs' car broke down in Joaquin, Texas, near the Country Inn on April 26, 2012. 5 RR 19. Grubbs and Deedra stayed that night at the Country Inn in Room 101. 15 RR 210 (State Exhibit 210); 9 RR 70. The State asserts that Grubbs did not have enough money to get the car repaired, so that next morning he went into another room at the Country Inn where two housekeepers and a handyman were

working, and shot and robbed them.  5 RR 19.  One of the housekeepers died as a result of the gunshot wounds she received; the other two employees of the Country Inn survived.  5 RR 19.

Grubbs and Deedra left the Country Inn in the handyman's car, 5 RR 19, and briefly headed southeast into Louisiana, but quickly made it back into Texas with the ultimate goal of returning to Montgomery County, in the hope of checking on their children. 5 RR 93, 6 RR 26.  The authorities located Grubbs and Deedra through their mobile phone use, and intercepted them on United States Highway 59 South, somewhere between Livingston and Cleveland.  5 RR 20, 93; 6 RR 83.  Grubbs and Deedra were ultimately apprehended just north of Cleveland around 2:15 p.m. on April 27, 2012.  5 RR 77, 83.  Grubbs was taken to the Montgomery County Sheriff's Office, where he was interrogated by Montgomery County Sheriff Detective Keith Echols.  6 RR 83.  Grubbs also made statements to DPS Trooper Sean Barnes at the scene of his arrest and during his transport to the Montgomery County Sheriff's Office.  6 RR 63, 68-73.  Redacted videos of statements from both of these interactions were admitted in evidence.  11 RR 32 (Exhibit 32), 11 RR 28, 29, 29a (Exhibits 28, 29, and 29a); 5 RR 102, 6 RR 49.  Grubbs contends that the statements he made during his interrogation by Detective Echols and in the presence of Trooper Barnes were not made voluntarily; and, as a result, they should have been excluded.  *See* 1 CR 83-85; 4 RR 42-42; 4 RR 80.

At trial, Grubbs conceded that he had in fact shot the two housekeepers and the handyman. 5 RR 23. Grubbs asserts, however, that he was legally excused from prosecution because, at the time of his actions, he was suffering from a psychosis that precluded his ability to differentiate right from wrong, resulting from his involuntary and unwitting intoxication that was inadvertently brought on by his ingestion of "Pump-It Powder." 5 RR 23. Grubbs asserts that on April 26, 2012, after getting off work and feeling tired, he stopped by a convenience store in Conroe, Texas to purchase a 5-Hour Energy Drink. 5 RR 22. Grubbs asserts that the convenience store clerk convinced him to try Pump-It Powder instead, and he purchased ten (10) units of that substance. 5 RR 22. Grubbs asserts that he ingested all the Pump-It Powder in a relatively short period of time, not knowing of the ill effects that it may cause, and that the cumulative use of that substance over that period of time created the psychosis that he suffered from over the next several hours, during the time when he allegedly committed the crimes at issue in this case. 5 RR 23.

At trial, Dr. Edward Gripon provided expert testimony concerning "Pump-It Powder," and the possible effects that it may have on a person that ingests it. 9 RR 5-68. Dr. Gipon testified that Pump-It Powder is one type of a variety of substances that are generally known as "bath salts," which are synthetic

amphetamines. 9 RR 17, 19. Dr. Gripon reported that bath salts, including Pump-It Powder, can certainly cause psychosis in a person that ingests it:

> It's reported in our literature … [T]he effects of bath salts is to cause delusions, hallucinations, and aggression in some people.

9 RR 26. Dr. Gripon also opined about the fact that a person can be fine one minute, then ingest the bath salt and be very disturbed, and then be normal after the effect wears off:

> Now you can take it in a series and make the effect longer. But if you take a single ingestion of a massive dose of bath salts, the effect would last three to six hours. So you could be very healthy and normal appearing at one point, and in the three to six hours be very disturbed, and eight hours later look normal again. So it's a short window.

9 RR 24. Obviously, Dr. Gripon was not present to witness Grubbs actually purchasing or ingesting the Pump It Powder; nor did he have a chance to observe Grubbs during the window of time that the substance would have had its ill effect. Dr. Gipon made this qualification on numerous occasions. *See, e.g.,* 9 RR 17, 26. But he did testify about Grubb's report of purchasing and using the Pump-It Powder, and the effect that it had on him:

> Q:  Did he report to you […] that in the past he had used Five-Hour energy drink?
>
> A:  Yes.
>
> Q:  And did he report to you […] that a convenience store operator had suggested a new substance?
>
> A:  Yes.

Q:    And what was that substance?

A:    It was a powdered form of something that he referred to by the name of Pump-It Powder.

Q:    Did he tell you how many doses or packages or containers of Pump-It Powder he got on that day?

A:    He told me he bought ten.

Q:    Did he tell you, as a result of that, any abnormal effects.

A:    It had a stimulant affect, that it gave him significant energy and kept him awake, kept him up for several days according to his account . . . [I]t caused him to be paranoid, suspicious, feeling that he was being followed, and that people looked abnormal to him. He described them as looking like some type of demon.

9 RR 16-17. Dr. Gripon continued:

A:    Well, that's the history that he gave. He said he, as I mentioned, became very paranoid and was believing that he was being followed around East Texas. That particular concoction is a bath salt – it's a common street name for it at least. And that's a known effect of that in some people. It doesn't do that to everyone. It's all in the magnitude of how much you take, over what period of time did you take it, and what did it do, how long did you stay up, that sort of thing.

9 RR 19. Grubbs' report of ingesting the Pump-It Powder was corroborated by the State's witness, Mr. Jimmy Stockton, who testified that he remembered Grubbs discussing with him the use of a bath salt and not feeling like being himself:

Q:    Did he [Grubbs] talk about Pump-It Powder, bath salts during that conversation?[1]

---

[1] The "conversation" mentioned here references a phone conversation that Stockton had with Grubbs on April 26, 2012. 6 RR 26 (just above the quoted exchange).

A: I think on that – that day something was said about it because of, you know, that he was not being himself, and that was – that's -- and all I remember was the word 'salt.' And I can't – I'm trying to remember if that was exactly that time –

Q: Or –

A: or before.

Q: And you visited with him a little later –

A: Yes.

Q: – after his arrest. And it may have been – he may have mentioned salt then.

A: Yes, sir.

***

Q: Describe the communication [that you had with Grubbs on April 27].

A: Well, it was a short communication; and it was mostly trying to explain to me that you know, he wasn't himself. It was like, he was under a different influence when all this happened, you know, because I have known him this long. He said, 'You know me. I wouldn't normally do this.'

***

Q: Do you remember him trying to suggest that the people had come after him, and that's why he had to shoot them?

A: A statement something similar to that, yes, sir; that they had tried to – because he wanted to get some keys, and they tried to come at him. Three people.

6 RR 27, 29 (Questions from the State). Stockton later confirmed his testimony when questioned by Grubbs' defense attorney:

Q: At some point in time, not only was Bobbie trying to tell you, trying to explain to you as a father figure – 'Oh my God, this wasn't me. This – I don't know what happened,' – he mentioned at least the word 'salts' or 'salt'?

A: Yes, sir.

6 RR 31. Further, in response to the State's assertion that Stockton did not mention Grubbs telling him about ingesting salts in his (Stockton's) statement to the authorities, Stockton and Grubb's defense attorney had these exchanges:

Q: [Grubbs' mentioning of the 'salts'] may have been during this time and it's not reflected in your statement? He said a lot of things, didn't he, that aren't in that statement?

A: Yes, sir.

*** 

Q: If someone said, 'Bobbie never told anybody about bath salts or Pump-It, is that a true statement?

A: No.

Q: He told you?

A: Yes.

Q: And is there any amount of influence or persuasion or love or loyalty you would have for Mr. Grubbs to sit there and lie to this jury about that?

A: No sir.

6 RR 31, 33-34.

Finally, during the testimony of Montgomery Sheriff Detective Keith Echols, the State published to the jury Exhibit 29, a DVD which purported to be a redacted version of the statement made by Grubbs to Echols on the evening of

April 27, 2012, at the Montgomery County Sheriff's Office. 5 RR 105. The purpose of the redactions, among other things, was to remove any express mentioning of, or reference to, any inadmissible evidence of extraneous crimes or bad acts on the part of Grubbs, so that Exhibit 29 would comply with the agreed order of the trial court. 5 RR 101. This specifically included, but was not limited to, any statement or suggestion that Grubbs had been previously convicted of a crime or had been previously incarcerated. 5 RR 116. However, Detective Echols carried a version of Exhibit 29 that retained two matters that were supposed to be redacted (but were not) on the version of the DVD that was introduced in evidence as Exhibit 29 and that was played to the jury:

- Grubbs telling Deedra, "If you move, I'm going to shoot you. I don't need to go back to the pen."

- Grubbs talks about his understanding of jailhouse procedure.

5 RR 108, 111. The first item was actually heard by the jury. 5 RR 108. The second one was not. 5 RR 108. The State stopped the DVD, and a bench conference was held outside the presence of the jury to address this issue. 5 RR 106. The State swapped out the incorrect DVD (which is now Exhibit 29a in the record) with the correct DVD (containing all the redactions). Based on this error, Grubbs moved the Court: (i.) to exclude the entire statement, (ii.) to strike what the jury had heard, and (iii.) to advise the jury to "consider it for naught." 5 RR 113.

The trial court denied Grubbs' request in total. 5 RR 113. Grubbs' then moved for a mistrial. 5 RR 117. The trial court denied that request as well. 5 RR 122.

In the end, on May 19, 2014, the jury found Grubbs guilty of one count of Capital Murder and two counts of Aggravated Assault. 9 RR 141-142. The Court sentenced Grubbs to confinement in the Institutional Division of the Department of Criminal Justice for life without the opportunity of parole on the Capital Murder charge, and confinement in the Institutional Division of the Department of Criminal Justice for life on each of the two aggravated assault charges. 5 RR 150.

## SUMMARY OF THE ARGUMENT

In this matter, Grubbs complains of four (4) errors committed by the trial court that were harmful. First, the trial court committed error when it failed to grant a mistrial, or in the very least exclude a statement made by Grubbs and issue a curative instruction, when the State played an incorrect DVD at trial that contained an admission in a statement from Grubbs, alluding to an extraneous offense, that had been previously ruled by agreement to be inadmissible. The fact that the jury heard Grubbs himself admit that he had "already been to the pen before" ruined any hope that Grubbs might have had in successfully asserting his defense in this case. Second, the trial court committed error by failing to include a definition and instruction on "involuntary intoxication" and its consequences. The virtual entirety of Grubbs' defense in this case rested upon his being excused from

legal responsibility for his acts based upon the psychosis that he suffered that was brought upon him by his involuntary and unwitting intoxication from his ingestion of Pump-It Powder. The absence of an instruction on "voluntary intoxication" kept Grubbs' sole defense completely out of the hands of the jury. Third, the trial court committed error by not suppressing the statements made by Grubbs to Montgomery County Sheriff Detective Keith Echols at the Montgomery County Sheriff's Office. Given the totality of the circumstances, his statement was not made voluntarily. Similarly, Grubbs raises the same issue in ground number four – namely that the Court committed error by not suppressing the statements made by Grubbs to DPS Trooper Sean Barnes while being transported to the Montgomery County Sheriff's Office, based on the fact that those statements were not made voluntarily.

## ARGUMENT

In this appeal, Grubbs asserts four (4) grounds of error in this case that entitle him to a reversal of the convictions and the granting of a new trial.

**A. The trial court committed error when it failed to grant a mistrial, or in the very least exclude the statement, when the State played an incorrect DVD at trial that contained an admission from Defendant in the statement that had been previously ruled by agreement as inadmissible.**

During the testimony of Detective Echols, the State mistakenly published to the jury a DVD (Exhibit 29) which contained an admission made by Grubbs that

had been previously ruled by agreement to be inadmissible. The jury heard the following on the DVD:

> Grubbs telling Deedra, "If you move, I'm going to shoot you. I don't need to go back to the pen."

5 RR 111. The State stopped the DVD, and a bench conference was held outside the presence of the jury to address this issue. 5 RR 106. The State swapped out the incorrect DVD (which is now Exhibit 29a in the record) with the correct DVD (containing a redaction of the above-statement). Based on this error, Grubbs moved the Court: (i.) to exclude the entire statement, (ii.) to strike what the jury had heard, and (iii.) to advise the jury to "consider it for naught." 5 RR 113. The trial court denied Grubbs' request in total. 5 RR 113. Grubbs then moved for a mistrial. 5 RR 117. The trial court denied that request as well. 5 RR 122.

The trial court's failure to exclude the statement based on this mistake was reversible error. The parties agreed at a pretrial hearing that the portions of the statement made by Grubbs that contained admissions of, or references to, extraneous offenses would be redacted. 2 RR 21.[2] The State's publication of Exhibit 29 to the jury, while inadvertent, was still clearly in violation of the agreed-upon order in this case. The Court of Criminal Appeals has explained that the remedy in a situation like this – generally a violation of a motion in *limine* –

---

[2] The parties had agreed that extraneous offenses, specifically including any allusion to Grubbs having been previously incarcerated, would be redacted from the DVD of the statement made by Grubbs to Echols. 2 RR 21, 5 RR 116. This was an agreement that was separate and apart from the question of whether the statement was made voluntarily, which is addressed herein below.

lies with the trial court. *Brazzell v. State,* 481 S.W.2d 130, 131 (Tex.Crim.App.1972) (holding that "the violation of a motion in limine may entitle a party to relief, but any remedies available with regard to such a violation are with the trial court" and that "if its order has been violated, the trial court may apply the sanctions of contempt or take other appropriate action.") As such, the admission or exclusion of evidence is a matter within the sound discretion of the trial court, which is reviewed under an abuse of discretion standard. *City of Brownsville v. Alvarado,* 897 S.W.2d 750, 753 (Tex.1995); *In re R.A.L.,* 291 S.W.3d 438, 446 (Tex.App.-Texarkana 2009, no pet.). A trial court abuses its discretion if its decision is arbitrary, unreasonable, and without reference to any guiding rules and principles. *Mercedes–Benz Credit Corp. v. Rhyne,* 925 S.W.2d 664, 666 (Tex.1996). "To reverse a judgment based upon error in the admission or exclusion of evidence, the appellant must show that the trial court committed error and that the error was reasonably calculated to cause and probably did cause rendition of an improper judgment." *R.A.L.,* 291 S.W.3d at 446; *McCraw v. Maris,* 828 S.W.2d 756, 757 (Tex.1992)). In this case, the trial court abused its discretion in failing to exclude the statement after the State's error.

Clearly, TEX. R. EVID. 404(b) (Goode Wellborne & Sharlot 2015) prohibits the admission of evidence of a crime, wrong, or other act to prove a person's character in order to show that on a particular occasion the person acted in

conformity with his character. This is true "because such evidence is inherently prejudicial and the defendant's alleged 'propensity to commit crimes' is not material to whether he is guilty of the specified conduct which he is charged." Goode Wellborne & Sharlot, *Texas Practice, Guide to the Rules of Evidence*, Vol. 1, pp. 203-204 (Thompson Reuters 2015) (citing numerous cases, including *Elkins v. State*, 647 S.W.2d 663, 665 (Tex. Crim. App. 1983)). Here, Grubbs was already facing an uphill battle with the jury, given the particularly egregious facts in this case. His defense was that "he was not himself" and that he was affected by a psychosis that came about as result of his unwitting and involuntary intoxication. The fact that the jury heard Grubbs himself admit that he had "already been to the pen before" shattered any hope that Grubbs might have had in successfully asserting that defense. Any chance that the jury would believe Grubbs was likely squelched upon their hearing that admission.

At the very least, the Court should have given the jury a curative instruction. Instead, the State determined that it was good enough simply to replace the erroneous DVD with the correct one, and pretend to the jury like nothing had happened. *See* 5 RR 109. Apparently, this was sufficient for the trial court because it denied Grubbs' requested relief for a curative instruction. 5 RR 113. But what the State did was not good enough. The trial court should have excluded

the statement as a whole, stricken what was heard from the record, and admonished the jury to disregard what it had heard, in total.

For this same reason, the trial court should have granted a mistrial. A trial court's denial of a mistrial is reviewed under an abuse of discretion standard, and its ruling must be upheld if it was within the zone of reasonable disagreement. *Coble v. State*, 330 S.W.3d 253, 292 (Tex.Crim.App.2010). Generally, it is presumed that the jury can and will follow a court's curative instruction to disregard objectionable testimony. *See Bauder v. State*, 921 S.W.2d 696, 698 (Tex.Crim.App.1996). But in this case, as discussed above, the trial court gave no curative instruction. Mistrial is an extreme and exceedingly uncommon remedy that is appropriate only when it is apparent that an objectionable event at trial is so emotionally inflammatory that curative instructions are not likely to prevent the jury from being unfairly prejudiced against the defendant. *Id*. Whether a particular error calls for a mistrial depends on the peculiar facts and circumstances of the case. *Hernandez v. State*, 805 S.W.2d 409, 413 (Tex.Crim.App.1990). Here, although inadvertent, the State' unquestionable error in publishing to the jury evidence that had been clearly ruled inadmissible completely gutted Grubbs defense and made it impossible for him to get a fair trial from then on out. The only remedy to cure that error would have been for the trial court to have granted a

mistrial.  Its failure to do so constitutes reversible error.  For this reason, Grubbs'

conviction should be overturned, and he should be granted a new trial.

**B. The trial court committed error by failing to include a definition and instruction on "involuntary intoxication" and its consequences.**

Grubbs' defense counsel presented a good deal of evidence in this matter

regarding Grubbs' unintentional and unwitting intoxication caused by his ingestion

of "Pump-It Powder."  *See Supra*, Statement of Facts, pp. 5-9.  The evidence in

this case was that Grubbs ingested the Pump-It Powder in the place of his normal

Five Hour energy drink, at the behest of a convince store clerk, for the purpose of

waking up – no different as if he were to purchase and drink some coffee – or

perhaps, an espresso.  9 RR 16-17.  Grubbs had no idea that it would cause the

reaction that it did.  9 RR 16-17.

Unquestionably, at the time of the incidents in question, bath salts, such as

Pump-It Powder had not yet been made illegal in Texas or the United States.  5 RR

158-159; 9 RR 33.  Yet, they can cause very similar effects to illegal drugs such as

PCP.  Such was made clear from Grubbs' defense attorney's questioning of State

witness DPS Trooper Dustin Ramos, who had previously testified that he is

specially trained in narcotics and drug interdiction:

Q:    Can you tell us what you know about bath salts?

A.    Bath salts? Right now it's a new – new growing phenomenon.
       You can ingest them. They've got it now where you can put
       them in a smokable tube and actually smoke it.  It's a new form

coming out that causes, I guess, same effects as PCP, that you kind of go out of your mind.

Q. Let me stop you there. I don't want to interrupt you. Will give you a chance to resume that thought. But if it has effects similar to PCP, is that a good thing on the human body?

A. No, sir, it's not.

Q. It will make you stark raving mad, will it not?

A. On some occasions, yes, sir.

Q. Not every time----

A. (head nodding.)

Q. --because obviously some of these people use it more than once, don't they?

A. Yes, sir.

Q. But you have seen in your experience people under the influence of PCP, have you not?

A. Yes, sir.

Q. And they're hard to control sometimes?

A. In most cases. It's up and down.

Q. And have you dealt with people under the influence of methamphetamine?

A. Multiple, yes, sir.

Q. and they're pretty agitated, hyper, and excitable, are they not?

A. Again, it goes up and down. You have low moments and high moments.

6 RR 160-161. As such, with the evidence presented, Grubbs was entitled to have a jury instruction on "involuntary intoxication."

The Court of Criminal Appeals in *Torres v. State*, 585 S.W.2d 746, 749 (Tex. Crim. App. 1979), provided for the defense of involuntary intoxication.[3] In *Torres*, the Court held that involuntary intoxication is a defense to criminal culpability when it is shown that:

1. the accused has exercised no independent judgment or volition in taking the intoxicant; and

2. as a result of his intoxication, the accused did not know that his conduct was wrong or incapable of conforming his conduct to the requirements of the law that he allegedly violated.

*Id.* at 749. That is precisely the situation in this case. In fact, the *Torres* case is quite similar to this case. The defendant in *Torres,* Ms. Torres, voluntarily drank a concoction made for her by her friend Robert Miranda to treat her for a headache. *Id.* at 748. The concoction contained "water, alka seltzer, and '4 or 5' 250-milligram tablets of Thorazine." *Id.* Miranda testified that Ms. Torres did not know that he had placed the Thorazine tablets in the drink. *Id.* Under the drug induced condition caused by the Thorazine tablets, Ms. Torres accompanied

---

[3] There has been some question as to whether the Texas State Legislature eliminated the defense of involuntary intoxication and overridden the holding in *Torres*. *See Alexander v. State*, 2002 WL 436993 at *3 (Tex. App. – Austin 2002) (not designated for publication). In *Alexander,* the court called the vitality of the *Torres* holding into question in light of the Court of Criminal Appeals' decision in *Giesberg v. State*, 984 S.W.2d 245, 250 (Tex. Crim. App. 1998) (holding that "a defense which is not recognized by the Legislature as either a defense or an affirmative defense does not warrant a special instruction."). But, there has not been any express overruling of *Torres* by any court, and numerous circuit courts have relied upon, cited, discussed, and mentioned *Torres* in the intervening years since *Giesberg* was decided. As such, Grubbs takes the position that *Torres* remains good law.

Miranda in the aggravated robbery of a Ms. Garcia. *Id.* Ms. Torres participated in the alleged crime by holding a knife on Ms. Garcia. *Id.*

In *Torres,* the Court of Criminal Appeals reversed Ms. Torres' conviction, holding that she was entitled to a charge directing the jury to acquit her if they (i.) found that she was involuntarily intoxicated, and (ii.) further found that she did not act voluntarily in the commission of the offense because of the intoxication. *Id.* The trial court had refused to give this charge. *Id.* Importantly, the Court of Criminal Appeals found that Ms. Torres was entitled to the charge in spite of the fact that "*the evidence of appellant's state of mind at the time of the offense [was] meager.*" *Id.* at 749 (emphasis added). The Court opined that the "limits of the defense itself" lies in the province of the jury, just as the credibility of the witnesses and the weight of the evidence." *Id.*

In this case, virtually the entirety of Grubbs' defense, as presented, rested upon his being excused from legal culpability based upon the psychosis that he suffered that was brought upon by his involuntary and unwitting intoxication from the ingestion of Pump-It Powder. However, a review of the jury charge in this matter indicates that while the jury was properly instructed on "insanity," there was no instruction on "involuntary intoxication." 2 CR 236-256. Instead, there was an instruction on "voluntary intoxication," which is clearly not a defense to the charges that Grubbs faced. *See* TEX. PENAL CODE Ann. §8.04 (Texas Lawyers

2015). Therefore, for the same rationale as provided in the *Torres* case, the trial court in this matter should have included in the jury charge an instruction for "involuntary intoxication." Its failure to do so was reversible error, and based on this error, this Court should reverse the convictions against Grubbs and order a new trial.

**C. The trial court committed error by not suppressing the statements made by Grubbs to Montgomery County Sheriff Detective Keith Echols at the Montgomery County Sheriff's Office.**

The trial court should have excluded the statements made by Grubbs to Detective Echols based on the ground that they were not made voluntarily.

The Court of Criminal Appeals has made clear that the mandate in TEX. CODE CRIM. PROC. Art. 38.22 (Texas Lawyers 2015) that statements be voluntary applies to both an accused's custodial and noncustodial statements because it provides that only "voluntary" statements may be admitted. *See Oursbourn v. State,* 259 S.W.3d 159, 171 (Tex.Crim.App.2008). Claims of involuntariness under Article 38.22 may be predicated on both police overreaching and on the state of mind of the criminal defendant. *Id.* at 172 (emphasis added). The question to be asked is "Does it appear—as Article 38.21 requires—that the statement was freely and voluntarily made without compulsion or persuasion?" *Id.* The Court of Criminal Appeals has instructed that in analyzing the defendant's state of mind, conditions caused by illness, medication, mental disability, mental capacity, and

intoxication may be considered as factors in determining whether the statement was voluntary. *Id.* at 172–73.

As a general rule, a determination whether a statement was voluntarily rendered is analyzed by examining the totality of the circumstances. *See Arizona v. Fulminante,* 499 U.S. 279, 285–86 (1991); *see Delao v. State,* 235 S.W.3d 235, 239 (Tex.Crim.App.2007). A trial court's ruling on the suppression of evidence is reviewed for an abuse of discretion. *Ramos v. State,* 245 S.W.3d 410, 418 (Tex.Crim.App.2008).

On May 6, 2014, the trial court entertained a hearing on a motion to suppress the statements made by Grubbs to Detective Echols. *See* 4 RR 50-79. In that hearing, defense counsel for Grubbs established that:

- There was one "*quid pro quo*"– Grubbs wanted to see and/or talk to his children, and the authorities allowed him to do so. 4 RR 70-71.

- While he was being interrogated, his back was against a wall for three hours and "some odd minutes" in a relatively small room. 4 RR 72.

- Detective Echols and Ranger Clark were sitting in close proximity to him at all times – about three to four feet in front of him. 4 RR 72.

- Detective Echols is 5'10" and 194 or 195 pounds. 4 RR 72.

- Ranger Clark is a "pretty good sized boy" and a "healthy individual." 4 RR 72-73.

- Grubbs is 5'10", and 170 pounds. 4 RR 73.

In addition:

- Grubbs was just recovering from a psychosis that he had been suffering from that was brought upon by his involuntary and unwitting intoxication from the ingestion of Pump-It Powder.  6 RR 27, 29.

- Grubbs was worried about the welfare of his children. 4 RR 58; 6 RR 26.

- Grubbs was worried about the welfare of his wife, Deedra.  4 RR 31; 5 RR 190.

- Grubbs had not slept for several days.  5 RR 143; 9 RR 16-17.

- Grubbs was nervous and was tapping his feet during the interrogation.  5 RR 143.

- Grubbs said some strange things during the interview with Echols.  5 RR 166.

- Grubbs' statements about Deedra's involvement in the case did not make sense to Echols.  5 RR 168.

Given the totality of the circumstances, as described above, and based upon the state of mind of Grubbs at the time of the interrogation, there is no way, regardless of what he might have said or done, that he could have given a knowing and voluntary statement. *See Oursbourn,* 259 S.W.3d at 172.  For this reason, the trial court should have excluded the statements made by Grubbs to Echols, and its failure to do was reversible error.  As such, this Court should reverse Grubbs' convictions in this case and grant him a new trial.

**D. The trial court committed error by not suppressing the statements made by Grubbs to DPS Trooper Sean Barnes while being transported to the Montgomery County Sheriff's Office.**

Similarly, the statements that Grubbs made to Trooper Barnes at the scene of his arrest and on the way to the Montgomery County Sheriff's Office were not voluntary, and, as a result, they should have been excluded.[4]

On May 6, 2014, the trial court entertained a hearing on a motion to suppress the statements made by Grubbs to Trooper Barnes. *See* 4 RR 1-50. In that hearing, defense counsel for Grubbs established that:

- At the time of Grubbs arrest, there were numerous law enforcement officers on the scene. 4 RR 26.

- The Montgomery County Sheriff's Office SWAT team, all in riot gear were present. 4 RR 27.

- The SWAT team was heavily armed. 4 RR 27.

- There were helicopters flying around and multiple law enforcement vehicles on the scene. 4 RR 27.

- Grubbs was placed on the ground and "secured." 4 RR 27.

- Traffic on Highway 59 was stopped for a considerable period of time. 4 RR 27.

- There were anywhere form 15-20 law enforcement officers on the scene. 4 RR 28.

- There was a lot of commotion and noise at the scene of the arrest. 4 RR 28.

---

[4] The standard and legal authority for this ground is the same as that as found in Ground C, Argument, *supra*, pp. 21-22. In order to avoid unnecessary repetition, Grubbs respectfully references the Court to that section for the recitation and discussion of the basic legal principals applicable to this ground.

- There was lots of chatter back and forth at the scene of the arrest. 4 RR 28.

- There was a lot of confusion at the scene of the arrest. 4 RR 28.

- A number of officers ("many") advanced to Grubbs to cuff him. 4 RR 28.

- At some point the law enforcement helicopter actually landed. 4 RR 29.

- Traffic was being diverted to the feeder road to get around the blockage of Highway 59. 4 RR 29.

- There was quite a bit of activity going on at the scene of the arrest. 4 RR 29.

- Deedra Grubbs (Grubbs' wife) was "secured" and then placed in an ambulance at the scene of the arrest. 4 RR 31.

- Grubbs was not told at any time that his discussions with Trooper Barnes were being videotaped. 4 RR 39.

- Trooper Barnes did not immediately turn the video camera to face Grubbs until he had already made a number of statements. 4 RR 40.

- Grubbs did not provide any written waiver of his rights as to self-incrimination. 4 RR 41-42.

In addition:

- Grubbs was just recovering from a psychosis that he had been suffering from that was brought upon by his involuntary and unwitting intoxication from the ingestion of Pump-It Powder. 6 RR 27, 29.

- Grubbs was worried about the welfare of his children. 4 RR 58; 6 RR 26.

- Grubbs was worried about the welfare of his wife, Deedra. 4 RR 31; 5 RR 190.

- Grubbs had not slept for several days. 5 RR 143; 9 RR 16-17.

Given the totality of the circumstances, as described above, and based upon the state of mind of Grubbs at the time of his arrest, there is no way, regardless of what he might have said, that he could have given a knowing and voluntary statement at

the time of his arrest, given all that was going on around him. *See Oursbourn,* 259 S.W.3d at 172. For this reason, the trial court should have excluded the statements made by Grubbs to Trooper Barnes during their discussion, and its failure to do was reversible error. As such, this Court should reverse Grubbs' conviction in this case and grant him a new trial.

## CONCLUSION AND PRAYER

**WHEREFORE PREMISES CONSIDERED**, Appellant Bobbie Grubbs respectfully requests that the Court: (i.) grant him oral argument in this matter, (ii) reverse the convictions in this case and grant him a new trial, and (iii.) grant to him any and all further relief to which he may be entitled.

RESPECTFULLY SUBMITTED,

LAW OFFICE OF STEPHEN SHIRES, PLLC
Attorney and Counselor at Law
123 San Augustine Street
Center, Texas 75935
Tel. (936) 598-3052
Fax. (936) 598-3031
stephen@shireslawfirm.com

By: /s/ Stephen Shires
**W. Stephen Shires**
**Texas Bar No. 50511894**
**Attorney for Bobbie Grubbs**

## CERTIFICATE OF SERVICE

This is to certify that on the 3rd day of June, 2015, **after 5:00 p.m.** a true and correct copy of the above and foregoing document was served on the following in accordance with the Texas Rules of Appellate Procedure:

Mr. Kenneth Florence
Shelby County District Attorney
200 San Augustine Street
Center, Texas 75935
(936) 598-4106 (Facsimile)

/s/ Stephen Shires
Stephen Shires

## CERTIFICATE OF WORD COUNT COMPLIANCE

I certify that the word count of this Appellant's Brief is 7028 words. I relied on the word count function of my word processor to determine this count.

By: /s/ Stephen Shires
Stephen Shires