IN the INTEREST OF M.T.

No. 04-16-00547-CV

Court of Appeals of Texas,
San Antonio.

Delivered and Filed: February 22, 2017

Shawn Darrick Sheffield, Law Office of Shawn Sheffield, P.O. Box 276343, San Antonio, TX 78227, for Appellant.

Michael Rogers Jr., Nicholas LaHood, Bexar County District Attorney's Office, 101 W. Nueva, Suite 370, San Antonio, TX 78205, for Appellee.

Sitting: Karen Angelini, Justice, Rebeca C. Martinez, Justice, Luz Elena D. Chapa, Justice

## OPINION

Opinion by: Karen Angelini, Justice

Appellant Jocelyn T. appeals the trial court's order terminating her parental rights to her son M.T. On appeal, Jocelyn T. argues that the evidence is legally and factually insufficient to support the trial court's finding that termination was in the best interest of the child. We affirm.

### BACKGROUND

On June 25, 2015, the Texas Department of Family and Protective Services filed a petition for protection of a child, for conservatorship, and for termination in a suit affecting the parent-child relationship. At the time M.T. was removed from Jocelyn T.'s care, M.T. was thirteen months old. On August 9, 2016, the case proceeded to a bench trial. Jocelyn T., who had notice of the trial, did not appear. Her attorney announced "not ready" and stated that the last time he had contact with his client had been July 15, 2016. The Department stated that Jocelyn T. had notice of the trial setting. It explained that it was also trying to make contact with Jocelyn T. because she had just given birth to a new baby. The trial court noted that M.T. was also a very young child and that this was the second trial setting. The trial court decided to proceed with the trial.

### A. Testimony of Vicki Williams

Vicki Williams, an investigator with the Department, explained that M.T. came into the care of the Department in June 2015:

> The referral came in for neglectful supervision. The allegation stated that mom and [Timothy W.][1] had gone to a

doctor's office. They had hit a grandmother and her granddaughter in the office while they were holding [M.T.] in the office.

According to Williams, when she spoke with Jocelyn T. during the investigation, Jocelyn T. and Timothy W. claimed that M.T. had been in the stroller during the incident. Williams testified, however, that there was videotape of the incident and what Jocelyn T. and Timothy W. claimed "wasn't true." "[T]hey were holding [M.T.]." Williams testified that even after being told of the videotape, Jocelyn T. still did not "change her story."

Williams testified that based on her investigation, she had concerns about M.T.'s welfare:

> I was told there was domestic violence between the couple—that they were seen in the apartment complex fighting, physically, between the two of them. [M.T.] was always clean when I saw him. He was never—you know, I wasn't necessarily concerned about the way they treated him, but the way they treated each other in front of him.

According to Williams, the Department had initially wanted "to do a parental child safety placement" and when she went to Jocelyn T.'s apartment to discuss the matter, Jocelyn T. "was willing to do it." Jocelyn T. called a friend who was willing to care for M.T. However, Timothy W. came home, demanded that Williams and the police leave the apartment, and stated that he would not allow M.T. to be taken care of by the friend. Williams testified that the Department then filed an affidavit for M.T.'s removal.

Williams testified that as a result of the incident at the doctor's office, both Jocelyn T. and Timothy W. were arrested. Jocelyn T. was charged with child endangerment,

---

1. The trial court also terminated Timothy W.'s parental rights to M.T. He did not appeal.

and Timothy W. was charged with two counts of assault bodily harm. Williams testified that Timothy W. had a felony warrant "out for his arrest."

### B. Testimony of Mary Rosetti

Mary Rosetti, a legal worker with the Department, testified that she was present at the chapter 262 hearing on July 8, 2015, and had an opportunity to speak with Jocelyn T. and Timothy W. She explained to them that the Department would be addressing "all the safety concerns that were in the home." Rosetti testified,

> I told them what the services would be and that they would have the opportunity to participate in a Family Group Conference, where they would be invited with their attorneys to discuss and create a family plan of service. At that time services would be created for them.

According to Rosetti, she explained that if they did not comply with the service plan created, did not engage in services, and did not address the Department's safety concerns as enunciated in the service plan, their parental rights could be terminated. Rosetti testified that at the family group conference on July 29, 2015, the service plan was created. The service plan required Jocelyn T. and Timothy W. to obtain employment, as well as housing. It also required them to engage in a drug assessment, as well as follow any resulting recommendations. Further, the service plan required that they engage in individual therapy to address the safety concerns of the Department. They were also required to complete a psychological evaluation and follow any recommendations. Finally, they were both required to submit to random drug testing and maintain contact with the Department. Rosetti testified that the family service plan containing those requirements was filed with the court.

Rosetti further testified that Jocelyn T. and Timothy W. did not agree with the service plan. Rosetti testified, "They felt that they did not require any type of drug assessment and they felt that the services were too intense and they did not need that much assistance." Jocelyn T. did complete some services, including a psychological evaluation, a parenting class, and a family violence prevention services class. She also visited M.T. consistently through Kid Share. However, Rosetti testified that Jocelyn T. did not engage in individual therapy, had not continued with drug testing, had not provided any residential information, and had not provided "any pay stubs." Jocelyn T. also had not maintained contact with Rosetti. Rosetti explained that the Department had concerns that Timothy W. "was not an appropriate person to be around [M.T.]" and that "there were concerns that he was continuing to use drugs." Rosetti had seen "several photographs" depicting Timothy W. "engaging in drug use." Rosetti testified that Jocelyn T. "assured [Rosetti] that she was not engaged in a relationship with [Timothy W.], nor was he around her." However, Rosetti testified that Jocelyn T. was "continuing that relationship with [Timothy W.]." Rosetti testified that on May 4, 2016, she went to a Kid Share visit and saw Jocelyn T. and Timothy W. walking together from the bus stop. According to Rosetti, because Timothy W. was engaging in drug use and Jocelyn T. was still in a relationship with him, the Department had concerns "that there might be drug use in the home."

With respect to housing, Rosetti testified that she had seen Jocelyn T. and Timothy W.'s apartment in July 2015, right after the chapter 262 hearing. Rosetti testified that Jocelyn T. and Timothy W. "were evicted from that home and were living on the streets." Rosetti "offered to pick them up and take them to the shelter." According to Rosetti, "[t]hey spent

one night at Haven for Hope in early September" but after that time, Rosetti "never had any knowledge of where they were residing." She noted that the one time she did speak with Timothy W., "he said he was staying in motels sporadically and then on the streets when he couldn't afford them."

Rosetti testified that Jocelyn T. never demonstrated that she was able or willing to provide for M.T.:

[T]he most important aspect was understanding the safety concerns of the Department and the fact that [Jocelyn T.] had put [M.T.] at risk. Not only—and the way to engage in services and understand those safety concerns was through individual therapy, maintaining contact with the Department and proving that she could provide a safe, secure and appropriate environment to M.T., all of which she was unable to demonstrate throughout the life of the case.

### C. Testimony of Angelica Villarreal

Angelica Villarreal, a Department worker, testified that she was assigned to M.T.'s case from June 2016 to August 2016. Villarreal attempted to get in contact with Jocelyn T. and could not make contact in June 2016. On July 6, 2016, Villarreal made phone contact with Jocelyn T., and they made an appointment to meet the very next day, July 7, 2016. Jocelyn T., however, did not show up for the appointment and did not call to reschedule. Villarreal testified that she reached out to Kid Share and asked the employees at Kid Share to pass a message to Jocelyn T. According to Villarreal, Jocelyn T. did visit with M.T. at Kid Share during that time. However, Jocelyn T., never made contact with Villarreal.

Villarreal testified that she had recently been made aware that Jocelyn T. had given birth to another baby on June 6, 2016. Because applicants for assistance programs typically provide an address, Villarreal investigated whether Jocelyn T. "was receiving any type of TANF or food stamps." Villarreal testified that she discovered Jocelyn T. had provided an address: 1300 West Martin. However, Villarreal was not able to locate Jocelyn T. at that address.

Villarreal testified that it would be in M.T.'s best interest for Jocelyn T.'s parental rights to be terminated. Villarreal explained that Jocelyn T. had been "given numerous opportunities to do services to alleviate the safety concerns," but had failed to alleviate those concerns and show she can provide M.T. with a safe and appropriate home. Villarreal testified that results from a hair follicle test performed in April 2016 on Jocelyn T. was positive for marijuana. Villarreal also testified that as a result of incident in the doctor's office, Jocelyn T. had been placed on probation for child endangerment.

Villarreal testified that M.T. has been in the same foster home since the beginning of this case and is doing "extremely well." Villarreal testified that M.T. has bonded with his foster parents and that his foster parents have been meeting M.T.'s needs.

### D. Testimony of Deborah Davis

Deborah Davis, a Human Services Technician, testified that she transported M.T. from his foster home to Kid Share for supervised visitation with Jocelyn T. Davis testified that on March 30, 2016, she "recognized [Timothy W.] sitting at the curb across the street from Kid Share." She notified the caseworker that Timothy W. was present and waiting for Jocelyn T. Davis testified that she also saw Timothy W. on May 4, 2016, when she was with Rosetti. Davis further testified that "in between those" two dates, she also saw Timothy W. "one more time at a bus stop waiting." Davis then saw Jocelyn T. and

Timothy W. meet at a gas station near Kid Share.

### E. Testimony of Clora Johnson

Clora Johnson testified that she is M.T.'s foster parent and has taken care of M.T. since the beginning of the case. Johnson testified that she would like to adopt M.T. According to Johnson, M.T. came into her care when he was fourteen months old. At that time, M.T. "wasn't walking, and we got services as far as therapy and things like that." Johnson testified that M.T. was now walking and running. "[H]e's a happy little boy." Johnson testified that M.T. gets along well with his peers and has come a long way since he was first placed in her home. Johnson confirmed that there was no violence in her home.

### F. Testimony of Lesley Oxendine

Lesley Oxendine, a legal worker with the Department, testified she had been assigned to M.T.'s case on August 1, 2016. At the time of trial, August 9, 2016, Oxendine had been assigned to the case for eight days. She testified that she had been "on leave" and knew nothing about the case. However, if the case were to continue, then she would remain as the legal worker assigned.

After hearing all the evidence, the trial court signed an order terminating Jocelyn T.'s parental rights to M.T. In the order, the trial court found that Jocelyn T.'s parental rights should be terminated under the following grounds:

(1) Jocelyn T. had engaged in conduct or knowingly placed the child with persons who engaged in conduct that endangered the physical or emotional well-being of the child;

(2) Jocelyn T. had failed to comply with the provisions of a court order that specifically established the actions necessary for her to obtain the return of the child who had been in the permanent or temporary managing conservatorship of the Department for not less than nine months as a result of the child's removal from her under Chapter 262 for the abuse or neglect of the child; and

(3) Jocelyn T. had used a controlled substance, as defined by Chapter 481, Health and Safety Code, in a manner that endangered the health or safety of the child, and (1) failed to complete a court-ordered substance abuse program; or (2) after completion of a court-ordered substance abuse treatment program continued to abuse a controlled substance.

The trial court also found that the Department had made reasonable efforts to return the child to Jocelyn T. and that termination of Jocelyn T.'s parental rights was in the best interest of the child. Jocelyn T. appeals, arguing only that the evidence is legally and factually insufficient to support the trial court's finding that termination of her parental rights is in the best interest of the child.

### DISCUSSION

Parental rights may be terminated only upon proof of clear and convincing evidence that (1) the parent has committed an act prohibited by section 161.001(b)(1) of the Texas Family Code, and (2) termination is in the best interest of the child. *See* TEX. FAM. CODE ANN. § 161.001(b) (West Supp. 2016). On appeal, Jocelyn T. does not contest the findings made by the trial court pursuant to section 161.001(b)(1). Her only argument on appeal is that the evidence is legally and factually insufficient to support the trial court's finding that termination of her parental rights is in M.T.'s best interest. *See*

TEX. FAM. CODE ANN. § 161.001(b)(2) (West Supp. 2016).

When the legal sufficiency of the evidence is challenged, we look at all the evidence in the light most favorable to the trial court's finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true. *In re J.O.A.*, 283 S.W.3d 336, 344 (Tex. 2009). "To give appropriate deference to the factfinder's conclusions and the role of a court conducting a legal sufficiency review, looking at the evidence in the light most favorable to the judgment means that a reviewing court must assume that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so." *Id.* (citation omitted). "A corollary to this requirement is that a court should disregard all evidence that a reasonable factfinder could have disbelieved or found to have been incredible." *Id.* (citation omitted). "If, after conducting its legal sufficiency review of the record evidence, a court determines that no reasonable factfinder could form a firm belief or conviction that the matter that must be proven is true, then that court must conclude that the evidence is legally insufficient." *Id.* at 344–45(citation omitted).

When a parent challenges the factual sufficiency of the evidence on appeal, we look at all the evidence, including disputed or conflicting evidence. *Id.* at 345. "If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *Id.* (citation omitted). In reviewing termination findings for factual sufficiency, we give due deference to the factfinder's findings and do not supplant its judgment with our own. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006).

Under Texas law, there is a strong presumption that the best interest of a child is served by keeping the child with a parent. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006). However, there is also a presumption that when the court considers factors related to the best interest of the child, "the prompt and permanent placement of the child in a safe environment is presumed to be in the child's best interest." TEX. FAM. CODE ANN. § 263.307(a) (West Supp. 2016). And, in determining whether the child's parents are willing and able to provide the child with a safe environment, the court should consider the following: the child's age, and physical and mental vulnerabilities; the willingness and ability of the child's family to seek out, accept, and complete counseling services and to cooperate with and facilitate an appropriate agency's close supervision; the willingness and ability of the child's family to effect positive environmental and personal changes within a reasonable period of time; and whether the child's family demonstrates adequate parenting skills, including providing the child with (1) minimally adequate health and nutritional care, (2) a safe physical home environment, (3) care, nurturance, and appropriate discipline consistent with the child's physical and psychological development; (4) guidance and supervision consistent with the child's safety; (5) protection from repeated exposure to violence even though the violence may not be directed at the child; and (6) an understanding of the child's needs and capabilities. *See id.* § 263.307(b). In addition, courts may consider other nonexclusive factors in reviewing the sufficiency of the evidence to support the best interest finding, including (1) the desires of the child, (2) the present and future physical and emotional needs of the child, (3) the present and future emotional and physical danger to the child, (4) the parental abili-

ties of the persons seeking custody, (5) the programs available to assist those persons seeking custody in promoting the best interest of the child, (6) the plans for the child by the individuals or agency seeking custody, (7) the stability of the home or proposed placement, (8) acts or omissions of the parent which may indicate the existing parent-child relationship is not appropriate, and (9) any excuse for the parent's acts or omissions. *Holley v. Adams*, 544 S.W.2d 367, 372 (Tex. 1976). This list is not exhaustive. *Id.*

In support of her argument that the evidence is legally and factually insufficient to support the trial court's best interest finding, Jocelyn T. emphasizes that there is evidence she visited with M.T. consistently, that she had completed a parenting class, and that she had completed a family violence prevention class. While Jocelyn T. did participate in supervised visitation with M.T. and did complete two classes required by the service plan, the evidence at trial shows Jocelyn T. cannot provide a safe and stable home for M.T. There is evidence that, along with Timothy W., Jocelyn T. became violent at a doctor's office while she was holding M.T. There is evidence that she is presently on probation for child endangerment as a result of that event. There is also evidence that (1) she and Timothy W. have engaged in domestic disturbances in the past; (2) she claimed to have no more contact with Timothy W.; and (3) she has continued to have contact with Timothy W. There is also evidence of drug use by Jocelyn T. The evidence shows her hair follicles tested positive for marijuana in a test conducted two months before she gave birth to another child in June 2016. There is also evidence that Jocelyn T. was told by the Department that she needed to gain employment and prove she could provide a safe and stable home for M.T. However, Jocelyn T. ig-nored these requirements and failed to provide the Department with any pay stubs or otherwise prove employment. There is also evidence she and Timothy W. had been evicted from their apartment, and even though Jocelyn T. was told by the Department she needed to show proof of residence, Jocelyn T. failed to provide the Department with an address. Therefore, the evidence at trial shows that Jocelyn T. has continued to maintain her relationship with Timothy W. notwithstanding violent behavior, drug use, unstable living arrangements, and unemployment.

Additionally, there is evidence that M.T.'s needs are being taken care of by his foster family and that he is thriving in his current placement. His foster mother testified that when M.T. was placed in her home at the age of fourteen months, he could not walk. His foster mother sought services to help M.T. and now he is a walking, running toddler. There is evidence that M.T. has lived with his foster mom since the beginning of this case and that he has bonded with her. His foster mom has also voiced a desire to adopt him.

Finally, we note that although Jocelyn T. complains the *Holley* factors were "largely ignored at trial," a court is not prohibited from reasonably forming a strong conviction or belief that termination is in a child's best interest simply because there may not be evidence of one or more *Holley* factors. *See In re C.H.*, 89 S.W.3d 17, 27 (Tex. 2002). Thus, whether we look at all the evidence in the light most favorable to the trial court's finding, or whether we look at all the evidence, including disputed or conflicting evidence, we conclude the trial court's best interest finding is supported by sufficient evidence. *See In re J.O.A.*, 283 S.W.3d at 344–45 (stating legal and factual sufficiency standards). We therefore affirm the trial court's order ter-

minating Jocelyn T.'s parental rights to M.T.

Rebeca C. Martinez, Justice, dissenting

Rebeca C. Martinez, Justice, Dissenting

Because I believe the Department failed to meet its burden to prove by clear and convincing evidence that termination of the parent-child relationship was in the best interest of M.T., I dissent.

As my reading of the facts differs from the majority's, I repeat them here. Vicki Williams, an investigator with the Department, testified that the case was referred to the Department due to an allegation that, while Jocelyn and her boyfriend, Timothy, were in the waiting area of a doctor's office, "they hit a grandmother and her granddaughter in the office while they were holding [M.T.]." Williams's review of a videotape of the incident confirmed that "they," i.e., Jocelyn and Timothy, were holding M.T. at the time of the assault. Williams was concerned about the welfare of M.T. because through the course of her investigation she "was told" that there was domestic violence between Jocelyn and Timothy. Williams was told that the two had been seen physically fighting. According to Williams, the Department attempted to engage in "Family Based" services with Jocelyn, which would have involved placing the child with a friend or relative and supervised visits, but Timothy refused. Due to his refusal, the Department removed M.T. from the home and placed him in foster care.

Mary Rosetti, the Department caseworker, testified that she created a service plan for Jocelyn and reviewed the plan with her at a family group conference on July 29, 2015. Jocelyn did not agree to the service plan—she felt that services were too intense and that she did not require drug assessment—but received a copy of the service plan and signed as accepting it.

The Department's service plan required Jocelyn to obtain employment and housing; engage in drug assessment; engage in individual therapy; complete a psychological evaluation; submit to random drug tests and test negative; and maintain contact with the Department. Supervised visitations were set up through Kid Share. The service plan was filed with the trial court and Jocelyn was ordered to do services. Rosetti stopped working on the case in March 2016; at that point, Jocelyn had consistently visited the child and completed the psychological assessment, a parenting class, and family violence prevention class. Rosetti, however, claimed Jocelyn was not in compliance with the service plan since she had not completed individual therapy, continued with drug testing, or maintained regular contact with the Department. Rosetti expressed concerns that Timothy was using drugs and was not an appropriate person for M.T. to be around. Jocelyn denied any involvement with Timothy, but Rosetti saw them together on several occasions. She visited Jocelyn's apartment in July, but testified thereafter, Jocelyn was evicted and living on the streets. Rosetti offered to pick her and Timothy up and take them to a shelter. Rosetti did not know where Jocelyn was currently residing.

There is no evidence from the Department for the time period between March 2016, when Rosetti stopped working on the case, and June 2016. Angelica Villarreal was the Department caseworker assigned to the case from June-August 2016. Villarreal reached Jocelyn by telephone in July and set up an appointment for a face-to-face meeting, but Jocelyn failed to attend. Jocelyn did not call to reschedule. Villarreal left messages for Jocelyn with the Kid Share staff, but Jocelyn did not contact Villarreal. Villarreal was aware that Jocelyn gave birth to another baby on June 6,

2016, but had not yet been able to locate her. Villarreal confirmed that Jocelyn was not in compliance with her service plan. Villarreal stated that a hair follicle test conducted on Jocelyn in April 2016 was positive for marijuana.

Lesley Oxendine inherited the case from Villarreal on August 1, 2016—eight days prior to trial. Oxendine testified that she had not attempted to contact Jocelyn since her assignment. Oxendine was unfamiliar with the case and the Department's permanency plan, if any, for M.T.

Deborah Davis was a Department Human Services Technician who worked with Rosetti on the case. Davis supervised some parent-child visits and also helped transport M.T. to the visits. Davis testified that she observed Jocelyn with Timothy at parent-child visits on March 30, 2016 and May 4, 2016.

M.T.'s foster mother, Clora Johnson, was the Department's final witness. M.T. had been in Johnson's care since he was removed from Jocelyn's home on June 25, 2015. Johnson testified that M.T. has thrived in her home and seems to be very happy. Johnson stated that Jocelyn provided clothing for M.T. from time to time, most recently on his birthday in May. Jocelyn had last visited with M.T. two weeks before trial. Johnson stated that she would like to adopt M.T. if parental rights were terminated. In closing, the Department stated that its goal for permanency for M.T. was adoption by Johnson.

Based upon my review of the evidence in this case, in conjunction with the *Holley* factors and the statutory factors in section 263.307(b) of the Family Code, I do not believe the trial court could have reasonably formed a strong conviction or belief that termination was in the best interest of M.T. *See In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005) (citing *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002)); *see also* TEX. FAM.

CODE ANN. § 263.307(b) (West Supp. 2016); *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976). No evidence was presented regarding any physical or mental vulnerabilities of M.T. M.T., who was two years old at the time of trial, was too young to express his desires. There were no prior out-of-home placements. The record contains no evidence of any harm faced by M.T. at the hands of Jocelyn. The Department based, in large part, its pursuit of termination of Jocelyn's parental rights on an allegation of child endangerment. The testimony concerning the event in question, however, was vague and conclusory. Williams testified: "They had hit a grandmother and her granddaughter in the [doctor's] office while they were holding [M.T.] in the office." Williams's testimony gave no indication of who "hit" whom, nor who "they" were. There is no evidence that Jocelyn was holding M.T. during the assault; in fact, the removing affidavit made by Williams reveals that Timothy was the one holding M.T. during the assault. And although Williams testified she had viewed a video recording of the incident, the recording was not admitted into evidence. Further, there is no evidence that M.T. was injured or even frightened during the assault. "Was he roughed up or injured or anything like that during that incident?" "No." Thus, there was no evidence during the time period in question of any emotional or physical danger to M.T. caused by Jocelyn.

Further, there was no evidence that the existing parent-child relationship was inappropriate. To the contrary, the Department acknowledged that Jocelyn was willing to engage in services and that she "consistently" visited M.T. Another caseworker testified that Jocelyn made all of her weekly visits, with the exception of two or three visits. The evidence showed that the visits between Jocelyn and M.T. were

appropriate, and that Jocelyn provided clothing for M.T. during the pendency of the case. There was no testimony that Jocelyn suffered from any parenting deficits. Williams testified that initially the Department wanted to do a parental child safety plan in cooperation with Jocelyn, but ultimately sought removal only because Timothy refused to place M.T. with a family friend. The trial court acknowledged that Jocelyn had been at every hearing except for the final trial, where her attorney announced not ready and indicated that Jocelyn "just had a baby."

The Department's focus throughout the bench trial was not on Jocelyn's actions, but her boyfriend's. A drug assessment was ordered for Jocelyn only because Rosetti saw "several photographs" in which Timothy was engaging in drug use and Rosetti felt that there "might" be drug use in the home. The assumptions made by the Department were wholly unsubstantiated. Williams testified that she was not concerned with Jocelyn's treatment of M.T., but only with "the way [she and Timothy] treated each other in front of [M.T.]." There was no testimony regarding any effect on the child. Williams even hypothesized that the alleged "domestic violence situation" may have been temporary given that Jocelyn was pregnant with her second child during the time period in question: "I think perhaps hormones maybe had a play in what was going on between them[.]" Williams also testified that parenting and anger management classes would have addressed the domestic violence issues; Rosetti subsequently testified that Jocelyn completed the parenting class and family violence prevention services class.

As the majority acknowledges, there is a strong presumption that the best interest of a child is served by keeping the child with a parent. *See In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006). Reviewing the record in its entirety, and given the fact that there was no evidence of most of the section 263.307 factors and the *Holley* factors, I would conclude that the Department failed to meet its high burden to establish by clear and convincing evidence that termination of Jocelyn's parental rights was in M.T.'s best interest. Thus, I would reverse the portion of the trial court's judgment terminating Jocelyn's parental rights to M.T. and render judgment denying the Department's petition for termination.