

# Fourth Court of Appeals
## San Antonio, Texas

## MEMORANDUM OPINION

No. 04-17-00225-CV

**IN THE INTEREST OF A.F.V.**, a Child

From the 225th Judicial District Court, Bexar County, Texas
Trial Court No. 2016-PA-00142
Honorable Richard Garcia, Judge Presiding

Opinion by:      Luz Elena D. Chapa, Justice

Sitting:         Karen Angelini, Justice
                 Marialyn Barnard, Justice
                 Luz Elena D. Chapa, Justice

Delivered and Filed:  August 2, 2017

AFFIRMED

Joseph appeals the trial court's order terminating his parental rights to his son A.F.V. (born in 2015).[1] He contends there is legally and factually insufficient evidence that termination of his parental rights is in A.F.V.'s best interest. We affirm the trial court's judgment.

### BACKGROUND

In January 2016, the Texas Department of Family and Protective Services filed a petition to terminate the parental rights of A.F.V.'s parents, Joseph and Mahogany. The Department removed A.F.V. based on allegations that he tested positive for amphetamines and methamphetamines at birth and on alleged concerns about the parents' ongoing drug abuse and

---

[1] To protect the identity of the minor child, we refer to the child's parents by their first names and to the child by his initials. *See* TEX. FAM. CODE ANN. § 109.002(d) (West 2014); TEX. R. APP. P. 9.8(b)(2).

domestic violence. A.F.V. was placed with his maternal grandmother, and Mahogany voluntarily relinquished her parental rights.

The case proceeded to a bench trial, at which Joseph, Mahogany, and Department caseworkers Eva Filoteo, Angelica Villarreal, and Monika Karki testified. Taylor Blake, who performed a substance abuse assessment on Joseph, also testified. The trial court thereafter terminated Joseph's parental rights[2] based on his use of a controlled substance and his failure to comply with provisions of his court-ordered family service plan. The trial court also found termination of Joseph's parental rights is in A.F.V.'s best interest. Joseph appeals, challenging only the legal and factual sufficiency of the evidence to support the trial court's best-interest finding.

## STANDARD OF REVIEW

A judgment terminating parental rights must be supported by clear and convincing evidence. TEX. FAM. CODE ANN. § 161.001(b) (West Supp. 2016). To determine whether this heightened burden of proof was met, we employ a heightened standard of review to determine whether a "factfinder could reasonably form a firm belief or conviction about the truth of the State's allegations." *In re C.H.*, 89 S.W.3d 17, 25 (Tex. 2002). "This standard guards the constitutional interests implicated by termination, while retaining the deference an appellate court must have for the factfinder's role." *In re O.N.H.*, 401 S.W.3d 681, 683 (Tex. App.—San Antonio 2013, no pet.). We do not reweigh issues of witness credibility but defer to the factfinder's reasonable determinations of credibility. *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005).

A legal sufficiency review requires us to examine the evidence "in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or

---

[2] The trial court also terminated Mahogany's parental rights, and she has not appealed.

conviction that its finding was true." *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002). We assume the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could have done so, and we disregard all evidence that a reasonable factfinder could have disbelieved or found incredible. *Id.* But we may not simply disregard undisputed facts that do not support the finding; to do so would not comport with the heightened burden of proof by clear and convincing evidence. *Id.* When conducting a factual sufficiency review, we evaluate "whether disputed evidence is such that a reasonable factfinder could not have resolved that disputed evidence in favor of its finding." *Id.* The evidence is factually insufficient "[i]f, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction." *Id.*

## CHILD'S BEST INTEREST

The best-interest determination is a wide-ranging inquiry, and the Texas Supreme Court has set out some factors relevant to the determination:

- the desires of the child;
- the emotional and physical needs of the child now and in the future;
- the emotional and physical danger to the child now and in the future;
- the parental abilities of the individuals seeking custody;
- the programs available to assist these individuals to promote the best interest of the child;
- the plans for the child by these individuals or by the agency seeking custody;
- the stability of the home or proposed placement;
- the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one; and
- any excuse for the acts or omissions of the parent.

*Holley v. Adams*, 544 S.W.2d 367, 372 (Tex. 1976). The list is not exhaustive, and not every factor must be proved to find that termination is in the child's best interest. *In re C.H.*, 89 S.W.3d at 27. Evidence of only one factor may be sufficient for a factfinder to form a reasonable belief or conviction that termination is in the child's best interest—especially when undisputed evidence shows that the parental relationship endangered the child's safety. *Id.* "Evidence that the parent

has committed the acts or omissions prescribed by section 161.001 may also be probative in determining the child's best interest; but the mere fact that an act or omission occurred in the past does not *ipso facto* prove that termination is *currently* in the child's best interest." *In re O.N.H.*, 401 S.W.3d at 684 (internal citation omitted). "A factfinder may infer that past conduct endangering the well-being of a child may recur in the future if the child is returned to the parent." *In re D.M.*, 452 S.W.3d 462, 471 (Tex. App.—San Antonio 2014, no pet.).

A.F.V. was sixteen months old at the time of trial. When a child is too young to express his desires, the factfinder may consider whether the child has bonded with his current caregiver and is well-cared for, and whether the child has spent minimal time with the parent. *In re J.D.*, 436 S.W.3d 105, 118 (Tex. App.—Houston [14th Dist.] 2014, no pet.). Caseworker Karki testified A.F.V.'s current caregiver, his maternal grandmother, is taking care of all of A.F.V.'s needs and has "been very timely about taking [A.F.V.] to the doctor." She also testified, as did Mahogany, that A.F.V. and Joseph seem to have a bond. Joseph testified that "[s]ince the day [A.F.V.] was born, he's . . . been a daddy's boy." According to Karki's testimony, A.F.V. was placed with his grandmother when he was approximately six months old in March. Villarreal also testified Joseph "had visits every Friday, but they were not consistent" and Joseph "would probably make one to two visits out of every month." Joseph testified he would be happy with A.F.V. staying with his grandmother "until [he] c[ould] bring him home." Karki testified the Department's plans are to continue pursuing adoption for A.F.V. by his grandmother.

Several witnesses testified about Joseph's drug abuse. *See In re M.T.*, 516 S.W.3d 607, 614 (Tex. App.—San Antonio 2017, no pet.) (considering evidence of a parent's drug abuse as relevant to child's best interest). Blake, who conducted Joseph's drug assessment in August 2016, testified she had recommended inpatient treatment. She stated Joseph admitted to using methamphetamines and marijuana, he started using methamphetamine when he was nineteen years old, and he was

thirty eight years old at the time of the assessment. According to Blake, Joseph admitted to using drugs "[t]hirty -- two days prior to the assessment." Mahogany testified she and Joseph were using "[m]eth" together approximately "once a week" at the beginning of the case, and she was concerned that if Joseph was still using drugs, "he might harm the baby." Caseworker Filoteo testified she attempted to have Joseph drug tested, but he refused. Caseworker Villarreal testified "it was hard to get [Joseph] to drug test. And then, there were occasions where he drug tested, but he was not clean." When the trial court asked Joseph whether he would submit to a drug test, Joseph testified the test would be positive, stating: "I got pain killers in me right now."

There was also evidence of domestic violence between Joseph and Mahogany. *See In re O.N.H.*, 401 S.W.3d at 685-86, 688-89 (considering evidence of domestic violence between parents as relevant to child's best interest). Villarreal testified that after Mahogany started engaging in counseling, Villarreal became aware of "some domestic violence between" Joseph and Mahogany. Karki testified Mahogany said there were several domestic violence incidents between Joseph and Mahogany, and Mahogany had reported two incidents to the police. Karki also testified she discussed domestic violence with Joseph and that he said to her, "if someone, like, makes you that upset, you snatch them by the head or neck." Filoteo testified that during the intake process for Joseph's parenting course, he "became belligerent and he was asked to leave." Regarding domestic violence in his relationship with Mahogany, Joseph testified he was "not going to be painted as a monster . . . it was both of [them]. And it shouldn't have happened, but it did."

Several witnesses also testified about the conditions of Joseph's home. *See Holley*, 544 S.W.2d at 372 (providing "stability of the home or proposed placement" as a best-interest factor). Karki testified she visited Joseph's home in December 2016, and "Joseph reported to [her] there was no working water. He indicated, for heat purposes, he may use the stove." Joseph testified his

house "was not suitable right now," he was not "set up . . . to take [A.F.V.] back into [his] home," his house "needs work," and he is remodeling. He further testified he has four dogs at home and he spends approximate $20 a month on dog food, but he does not take the dogs to the vet. Joseph stated he told Karki "the water was turned off because [he] turned it off. [He] had a busted water line because [his] pipe froze and [he] had to find it to fix it."

There is also evidence showing Joseph did not complete programs required by his court-ordered family service plan. *See id.* (providing "programs available to assist these individuals to promote the best interest of the child" is a best-interest factor to consider). Villarreal testified that in addition to addressing his substance abuse, Joseph's service plan required him to complete counseling, which he did not do. Karki testified Joseph had not obtained drug treatment, attended "AA," or completed individual counseling services. She testified, however, Joseph had completed a parenting course and attended counseling "[o]nce maybe." Joseph testified that after the case was filed, he did not receive his "service plan until three months later." He stated he completed his parenting course and started attending counseling, but he "got sick one time and [he] didn't make another appointment, [he] forgot, and they dropped [him] from it." Joseph explained he could not attend inpatient drug treatment because he worked as a handyman and would be unable to make money to support his son.

Furthermore, the evidence shows Joseph did not comply with his court-ordered child support obligations. *See B.C. v. Tex. Dep't of Family & Protective Servs.*, 446 S.W.3d 869, 876 (Tex. App.—El Paso 2014, no pet.) (considering failure to pay child support as relevant to child's best interest). Karki testified the trial court ordered Joseph and Mahogany to pay $250 a month in child support while they were in a relationship, and then ordered Joseph to pay $125 a month after he and Mahogany were no longer together. Villarreal testified Joseph never "followed through" with paying child support. Joseph testified he paid a total of $250 in child support since April 1,

2016. Karki testified she asked A.F.V.'s grandmother if Joseph provided any nonmonetary assistance, and the grandmother told her Joseph "tried to help with a car seat at one time, maybe providing diapers."

Although Joseph argues there is testimony that he did not engage in inpatient therapy because he needed to earn money to support A.F.V., there is also evidence showing Joseph did not make child support payments, provide much nonmonetary assistance to A.F.V.'s grandmother, and continued to abuse drugs. We do not reweigh issues of witness credibility and must defer to the trial court's reasonable credibility determinations. *See In re J.P.B.*, 180 S.W.3d at 573. Having considered all of the evidence, we hold a factfinder could reasonably have formed a firm belief or conviction that termination of Joseph's parental rights to A.F.V. is in A.F.V.'s best interest. Because we conclude the evidence is legally and factually sufficient to support the trial court's best-interest finding, we overrule Joseph's sole issue.

## CONCLUSION

We affirm the trial court's judgment.

Luz Elena D. Chapa, Justice