

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-18-00249-CV

_____

IN THE INTEREST OF J.H., A CHILD

---

On Appeal from the 393rd District Court
Denton County, Texas
Trial Court No. 17-2996-393

---

Before Gabriel, Kerr, and Pittman, JJ.
Memorandum Opinion by Justice Gabriel

**MEMORANDUM OPINION**

Appellant P.H. (Mother) appeals from the trial court's order terminating her parental rights to her son J.H. (John).[1]  In three issues, Mother argues that the trial court abused its discretion by admitting and relying on inadmissible hearsay evidence, that the evidence was insufficient to support an alleged conduct ground, and that the evidence was insufficient to support the best-interest ground.  Because the trial court did not abuse its discretion by admitting the disputed evidence and because the evidence was sufficient to support the trial court's termination decision, we affirm the trial court's order of termination.

## I.  BACKGROUND

### A.  MOTHER AND JUSTIN

Mother was sixteen when John was born in 2010.  Mother never knew who John's father was.  In approximately 2012, Mother began a relationship with Justin and soon thereafter, she moved in with Justin.  Justin's apartment was in the same complex where Mother's mother Ann lived with John.  John would stay with Mother and Justin on the weekends and with Ann during the week.  Justin had two sons with his wife, to whom he was still married, and Justin's sons would stay with Justin and Mother on alternating weekends.  Justin noted that Mother was "hostile" toward his sons, using excessive corporal punishment, and was unable to control her anger.  In

---

[1]We use aliases to refer to the parties and their family members.  *See* Tex. Fam. Code Ann. § 109.002(d) (West Supp. 2018); Tex. R. App. P. 9.8(b)(2).

one instance, Mother bit Justin's older son's arm, leaving a bruise. Mother and Justin both used illegal drugs, including marijuana, during their relationship. Additionally, Mother had been diagnosed with bipolar disorder but would not take her medications in the correct dosages when she took them at all. Mother repeatedly threatened to commit suicide and in 2016, she cut her arms in an attempt to do so.

In 2015, Mother had a son with Justin—Sam. After Sam was born, Mother and Justin continued to smoke marijuana in the home even while the four children were present. In 2016, Mother and Justin's relationship became physically violent, resulting in domestic-violence convictions for both. John and Sam were present during many of Mother and Justin's fights. Mother recognized that she put Justin's interests above those of John or Sam.

## B. TERMINATION PETITION, REMOVAL, AND RETURN

In April 2017, the Department of Family and Protective Services (DFPS) filed a termination petition after they received reports that Mother and Justin used marijuana in front of the children. *See* Tex. Fam. Code Ann. § 161.001 (West Supp. 2018). They sought termination of Mother's rights to John if reunification was not possible.[2] When Mother's hair follicle tested positive for cocaine, she admitted that she had been using cocaine in addition to marijuana, spending approximately $1,400 a

---

[2]DFPS also requested the termination of John's unknown father's parental rights. DFPS filed a separate petition regarding Mother's and Justin's parental rights to Sam, which is still pending in the trial court.

3

month on cocaine. DFPS set up services for Mother, including parenting classes and counseling, and John and Sam were placed with Ann full time. Mother was ordered to make monthly child- and medical-support payments to DFPS. *See id.* § 154.001 (West Supp. 2018).

Mother and Justin broke up in June 2017 after one of their altercations resulted in Mother's hospitalization, and she moved back in with Ann. Mother again tested positive for marijuana and cocaine. Mother moved to a "sober living house," and her new service plan required her to participate in an intensive outpatient drug-treatment program and counseling. Mother had supervised visitation with John and Sam, and DFPS eventually allowed Mother to move back in with Ann in February 2018. On March 4, Taleah Howard, John and Sam's DFPS caseworker, prepared a "Closing Summary" in which she explained the case would be closed but noted that DFPS was concerned about "the relationship and drug use between [Mother] and [Justin]."

### C. SAM'S INJURIES

Before the case could be closed, Mother took Sam to a hospital in Plano on March 19 after she found him that morning with several bloody injuries to his face. Mother informed hospital personnel that there was an open DFPS "case due to father with domestic abuse towards mother." Mother told the treating doctor that Sam had a history of night terrors and that he had awakened her that morning complaining about his eye. Mother saw that Sam had "bruising and abrasions" on his face. Mother also denied any "concerns for abuse" or "safety issues for the children." The

4

treating physician noted that she told Mother it was "odd that [Mother] did not hear [Sam] fall or scream prior to getting the abrasions to his face" but that the injuries had a "slight appearance of scratches." However, the doctor concluded that based on the information Mother gave her, there was a "[l]ow suspicion for abuse by mother" and referred Sam to a sleep-disorders center.[3]

Before taking Sam to Plano, Mother had contacted Howard to tell her about Sam's injuries, initially stating that she did not know how Sam had been hurt—"they woke up and [Sam's] face was like that." Howard told Mother to keep her informed. After returning from Plano, Mother sent the hospital report to Howard, which included Mother's report of night terrors. Mother also told Howard that the doctor at the Plano hospital had concluded that Sam's injuries were self-inflicted. This was the first time Howard was told that Sam had night terrors. Indeed, none of Sam's prior medical records mentioned night terrors, and Mother admitted she had never before reported that he had them.[4]

Mother texted pictures of Sam's face to Howard, and Howard told Mother that she would meet them at a hospital in Fort Worth. Howard met with the treating doctor and told him about the night terrors Mother had mentioned. Mother was not

---

[3]A subsequent sleep study of Sam found that he experienced no night terrors.

[4]Mother attaches to her reply brief Sam's play-therapy records from January 13, 2018, in which a "nightmare" Sam had was mentioned. These records are not part of the appellate record; thus, we may not consider them. *See Ahmed v. Sosa*, 514 S.W.3d 894, 896 (Tex. App.—Fort Worth 2017, no pet.).

5

allowed to meet with the doctor. Sam told hospital staff that "the spider hurt him." The doctor concluded that Sam's injuries could have been the result of a fall, which Howard told Mother.

DFPS had Sam's medical records reviewed by the CARE[5] team at the Fort Worth hospital. Based on a review of the records from both hospital visits, the CARE team concluded that Sam's bruises, "some in a patterned configuration, to the face are highly suspicious for physical abuse." Sam's injuries were not consistent with a fall or an accident but were more consistent with abuse.

DFPS again removed Sam and John from Mother's custody and placed them in foster care pending an investigation of the incident. Mother was ordered to complete additional services. Laura Hastings, a DFPS psychologist who evaluated Mother, found that Mother seemed resistant to substance-abuse treatment and was unaware of the impact of her behavior on John and Sam. Mother also would not take responsibility for DFPS's involvement, had poor impulse control, lacked empathy, and was narcissistic. Hastings noted that Mother needed substantial assistance to function as a parent, was extremely dependent on Ann, and was vulnerable to poor relationship choices.

John began counseling and told his counselor, Frank Odiachi, that Mother and Ann had coached him to say Sam's injuries had been caused by Sam's night terrors.

---

[5]CARE is an acronym for Child Advocacy Resources and Evaluation.

6

This was traumatic for John because he was being asked to lie to protect Mother and he did not want Mother to be mad at him. John told Odiachi that Sam's injuries happened when Mother "kind of accidentally struck [Sam]" with "something . . . in the hand" that "[k]ind of slashed through the face." John expressed fear of Justin and seemed traumatized by the abuse he had witnessed when Mother was living with Justin. John was fearful that Mother would let Justin return. Similarly, Odiachi noted that Sam was "[v]ery, very aggressive," which Odiachi attributed to his exposure to domestic violence. Odiachi believed John would be traumatized if Mother's parental rights were terminated, but he recognized that John needed a stable home.

When Howard asked John what had happened to Sam's face, he stated that he did not know but that Sam had night terrors. Sam told Howard that "Spiderman did it."[6] Howard became concerned that John had been coached to say Sam had night terrors. John and Sam's subsequent caseworker, Katelyn Billings, also noted that DFPS was concerned that Mother and Ann had coached John about the true cause of Sam's injuries. Billings stated that such coaching would damage John's emotional well-being.

---

[6]Mother and Ann stated that Sam idolized Spiderman and would pretend to be him.

7

## D. TRIAL

Before the trial was held on the State's petition, Mother and DFPS unsuccessfully attempted mediation. John's guardian ad litem filed a report ten days before trial in which she recounted her concerns that Mother had coached John:

> In March 2018, [John] and [Sam] were removed from a return to monitor with [Mother] after facial injuries were sustained by [Sam]. After examination, it was concluded by members of the Care Team . . . that these injuries were not self-inflicted by the child and were consistent with non-accidental trauma. [Mother] has maintained that these injuries were caused by [Sam] to himself during a night terror. [The guardian ad litem] has received information through the current therapist for the children that [John] made an outcry that [Mother] hit [Sam] in the face with an object and was responsible for inflicting these injuries. [John] also reported that he was encouraged by [Mother] and [Ann] to tell others involved in the case that [Sam] hurt himself during a night terror. It is concerning to [the guardian ad litem] that [Mother] would injure her child and then encourage the children to be dishonest with others in what appears to be an effort to conceal her actions. It is a concern for [the guardian ad litem] that [Mother] may not be fully in control of her anger and is not demonstrating learning from the services that she participated in during the course of this case.

The guardian also stated that "throughout this case" Mother "continued to communicate regularly with [Justin] via phone, text, or Snapchat" and that some of these messages were sexually explicit.

At the July 2018 bench trial, evidence was admitted showing that Mother had completed many of the ordered services but that she had been unsuccessfully discharged from counseling and had failed to pay child support as ordered. Mother testified that she did not complete the required counseling, which had been ordered after the injuries to Sam, because "[t]here were times I was out of town, I had work or

8

I forgot to call off, or miscommunication." Odiachi testified to John's outcry about the cause of Sam's injuries, and his counseling notes were admitted into evidence. Justin testified that he did not believe Mother's parental rights to John should be terminated. John's attorney ad litem agreed that termination of Mother's parental rights would not be in John's best interest.

Billings testified that DFPS urged termination of Mother's parental rights because of her physical abuse of Sam while John was present even after she had taken anger-management and parenting classes, because John and Sam had been unsuccessfully returned to Mother after removal, and because Mother had coached John to lie about Sam's injury. The guardian ad litem concurred with Billings and recommended terminating Mother's parental rights for the reasons stated in her pretrial report. She explained that Mother's continued contact with Justin was a problem because they had a history of domestic violence, because Mother had admitted that Justin was "her relapse trigger," and because she had previously stated that Justin encouraged her to not take her required mental-health medications. The guardian ad litem agreed that termination would cause John trauma but no more than he had experienced by living with Mother. Hastings testified that any trauma from the termination could be dealt with in John's therapy.

The trial court recognized that the case was "tough" because Mother had made "tremendous progress as a person" during the pendency of DFPS's petition. But the court concluded that clear and convincing evidence supported both an alleged

9

conduct ground—section 161.001(b)(1)(D) or (E)—and that termination was in John's best interest:

> [The attorney ad litem] came to a different conclusion . . ., but I just weighed the factors differently. [The attorney ad litem] talked about - - because what I had to look at was what happened after the return and monitor, because it's become clear to me after ten years of sitting on the bench and having over 400 [DFPS] cases that what is important is what happens often not while everyone's looking at you but when no one's looking at you. And two things bothered me. Something happened with the child. And for the record, I do find that there was a - - I do think it was an anger outburst, which would have been bothersome enough, but coupled with that was what I do find to be the coverup and the lying about it and telling a child to lie about it.
>
> Two was the failure to complete the counseling, because you do have a mental health issue, and it's clear from the psychologist and psychiatrist that counseling is an integral component to ensuring your well-being. I will tell you absent those two factors, I would have gone the other way.

On July 27, 2018, the trial court signed an order of termination, terminating Mother's and the unknown father's parental rights to John and appointing DFPS as John's permanent managing conservator. Mother requested findings of fact and conclusions of law, which the trial court signed on August 27, 2018. In its findings, the trial court found Justin, Howard, Billings, Odiachi, Hastings, the CARE team director, a CARE team nurse, and the guardian ad litem to be credible. The trial court recognized Mother's past issues with domestic violence and drugs and found that Sam's injuries were not consistent with a fall or night terrors but were consistent with "being struck with an object." The trial court specifically found that John was told to

10

lie about how Sam was injured and that Sam's injuries "were the result of an act by [Mother]."

### E. APPEAL GROUNDS

Mother appeals and asserts that the evidence was legally and factually insufficient to support the trial court's holding that she violated either subsection (D) or (E) of section 161.001(b)(1) or that termination of her parental rights was in John's best interest. She also asserts that the trial court erred by admitting and relying on hearsay evidence—John's statements to Odiachi.

## II. DISCUSSION

### A. HEARSAY

We begin with Mother's evidentiary issue directed to the admission of Odiachi's testimony about John's statements made during their counseling sessions, which we review for an abuse of discretion. *See In re J.F.C.*, 96 S.W.3d 256, 285 (Tex. 2002); *In re R.A.L.*, 291 S.W.3d 438, 446 (Tex. App.—Texarkana 2009, no pet.). In questioning Odiachi about John's statements, DFPS asked where Ann was when Sam's injuries were discovered. Odiachi testified that Ann "was there" and that John had "been coached [to] not say this [was] how it happen[ed]." DFPS then asked what exactly John had been coached to say, which Mother unsuccessfully objected to as "hearsay." Odiachi testified that John had been coached "just tell them what they want to hear . . . about an accident." Odiachi then began to recount what Mother and Ann had specifically told John, and Mother objected "as to what [Ann] said." Mother

11

did not object to Odiachi's proffered testimony about what Mother had told John to say. In any event, Mother's objection was overruled, and Odiachi stated that Mother and Ann had told John to say Sam had a "night terror." Later when DFPS sought admission of Odiachi's session notes, Mother objected "to any statements made by [John] as hearsay." The trial court overruled the objection because they were "statements made during the course of medical treatment" and because they were admissible under the family code as a statement of a child-abuse victim. Tex. Fam. Code Ann. § 104.006 (West 2014). Odiachi later testified that John disclosed that Mother told John to "say night terror." Mother did not object to this testimony. Howard similarly testified that she believed John had been coached specifically to say "night terrors," which would be an unusual term for a seven year old to use. And in the guardian ad litem's pretrial report, she had also informed the trial court that Mother and Ann had "encouraged" John to say Sam had a night terror.

First, Mother did not preserve this issue for our review. *See* Tex. R. App. P. 33.1(a)(1); Tex. R. Evid. 103(a)(1)(A). During Odiachi's testimony about what Mother and Ann specifically told John about Sam's injuries, Mother did not object to Odiachi's testimony as to what Mother had told John to say about Sam's injuries, only as to what Ann had said. Also, Mother failed to object each time Odiachi testified to John's statements. Second, John's statements to Odiachi, a professional counselor, during his counseling sessions were pertinent to Odiachi's treatment of John and were not excludable as hearsay. *See* Tex. R. Evid. 803(4); *In re M.G.*, No. 05-01-01961-CV,

12

2002 WL 31599020, at *9 (Tex. App.—Dallas Nov. 20, 2002, pet. denied) (not designated for publication). Third, the evidence that John had been coached was admitted through Howard's testimony and the guardian ad litem's pretrial report with no objection; therefore, there could be no harm arising from the earlier admission of this same evidence through Odiachi's testimony. *See In re J.N.*, No. 05-14-00558-CV, 2014 WL 4978656, at *2–3 (Tex. App.—Dallas Oct. 7, 2014, pet. denied) (mem. op.). For these reasons, we overrule issue three.

## B. SUFFICIENCY OF THE EVIDENCE

### 1. Standards and Scope of Review in the Termination Context

Although the parent-child relationship is to be protected, it may be terminated upon a showing by clear and convincing evidence that the parent's actions satisfy a statutory ground justifying termination and that termination would be in the child's best interest. *See* Tex. Fam. Code Ann. §§ 161.001(b), 161.206; *In re E.R.*, 385 S.W.3d 552, 554–55 (Tex. 2012). Evidence is clear and convincing if it "produce[s] in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code Ann. § 101.007 (West 2014).

If the legal sufficiency of the evidence is challenged, we review all the evidence in the light most favorable to the challenged finding, resolving any disputed facts in favor of the finding if a reasonable fact-finder could have done so and disregarding all evidence that a reasonable fact-finder could disregard. *See In re J.P.B.*, 180 S.W.3d 570,

13

573 (Tex. 2005). We may not re-weigh or re-determine credibility issues, deferring to the fact-finder's determinations if reasonable. *See id.* at 573–74.

A factual-sufficiency issue also requires a review of the entire record, giving due deference to the fact-finder's findings. *See In re A.B.*, 437 S.W.3d 498, 500 (Tex. 2014). Evidence is factually sufficient if a fact-finder could reasonably form a firm conviction or belief that a conduct ground was violated and that the termination of the parent-child relationship would be in the child's best interest. *See In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002).

Mother contends that the scope of our review is limited to those termination bases specifically mentioned by the trial court at the conclusion of the trial: Mother's coaching John to lie about the injuries to Sam that she had caused and her failure to complete counseling. In its subsequent findings of fact, the trial court found that John had been coached to lie about Sam's injuries and that Sam's injuries "were the result of an act by [Mother]." It also found that Mother failed to complete the required counseling. But the trial court also found that Mother had abused cocaine and marijuana since John's birth and that domestic violence, "sometimes initiated and perpetrated by [Mother]," occurred in John's presence. The trial court further found that Mother "engaged in conduct that was both physically and emotionally endangering to the child." These findings led the trial court to conclude that the termination of Mother's parental rights to John was supported by clear and convincing evidence. Because the findings and conclusions reflect that the trial court

14

did not in fact limit itself to Mother's coaching and failure to complete counseling, we are not so constricted in our review. *Cf. ODIN Demolition & Asset Recovery, LLC v. Marathon Petroleum Co.*, No. 01-17-00438-CV, 2018 WL 4131038, at \*7 (Tex. App.—Houston [1st Dist.] Aug. 30, 2018, no pet.) (mem. op.) (recognizing oral statements are not findings or conclusions and written order is guidepost for ruling's basis); *Seasha Pools, Inc. v. Hardister*, 391 S.W.3d 635, 640 (Tex. App.—Austin 2012, no pet.) (stating oral pronouncements are not findings or conclusions and written judgment controls over conflicting oral pronouncement).

## 2. Conduct Ground

The trial court concluded that Mother had violated two conduct grounds listed in section 161.001(b)(1): subsections (D) and (E). These subsections prohibit a parent from endangering the child's physical or emotional well-being by (1) knowingly placing the child in endangering conditions or surroundings, (2) knowingly allowing the child to remain in endangering conditions or surroundings, (3) engaging in endangering conduct, or (4) knowingly placing the child with a person who engaged in endangering conduct. Tex. Fam. Code Ann. § 161.001(b)(1)(D)–(E). The trial court heard evidence that Mother had a past drug problem that was triggered by her relationship with Justin. It further heard that Mother continued to have contact with Justin even though John was scared of Justin. Mother's relationship with Justin featured repeated violence toward each other and toward Justin's sons, some occurring in John's presence. Mother did not move out of Justin's apartment until

15

after DFPS became involved based on their use of marijuana in front of the children. Further, the trial court found that Mother had hit Sam while John was in the house and that she had coached John to lie. This coaching traumatized John. Although there was evidence that Mother had completed several of the assigned services, the evidence also showed that she had not completed counseling after the incident when Sam was injured in March 2018, which the trial court stated was a factor in its termination decision. We may not second-guess any of the credibility determinations the trial court made as part of its termination decision.

DFPS's closing argument to the trial court helpfully summed up the entirety of the evidence to support the violation of an endangerment ground:

> Your honor, returning [John] to [Mother] is putting him at risk for physical abuse and emotional abuse. We have to look no further than the counseling notes that were provided by Frank Odiachi. The notes read like a horror story of the life that this 7-year-old has lived up to this point. We have witnessing domestic violence, suffering physical abuse, suffering mental abuse, witnessing physical abuse. And all of this was either at the hands of [Mother] or someone else that she introduced into his life.
>
> The grounds are met in this case by clear and convincing evidence because you have to look at the totality of the case. We can't look at parts of this case independent of the others, and we have to start at the very beginning. . . .
>
> . . . .
>
> We have to look at everything in this case. Now did she work some services through this case? Yes, she did. And she got to a point where the Department, as well as the other parties, thought at this point let's give it a chance to return these children and see how she does while being under the watchful eye of the Department and this court. The

16

order for return and monitor was signed on February the 16th of 2018. On March the 19th of 2018, [DFPS] receives notice of these injuries. 31 days in her unsupervised care before one of the children is injured. And she touts the fact that she reported the injuries. These are not injuries she was going to be able to hide from the Department. So instead she switches track, and she and her mother decide instead of hiding the injuries they decide to hide how the injuries occurred.

Now - - and we look at these injuries. We look at the stories that were presented [that] make no sense. "He was fine when I put him to bed. I heard no crying. I heard no falling out of the bed. I heard nothing." And then in the morning this child is covered in blood with injuries on his face. That's just not realistic.

The night terrors that she told the first hospital we've now completely ruled out. All the doctors have ruled out, and I believe they've now stated that it wasn't, in fact, night terrors. . . . We know that it's not a result of the fall, an accidental fall. . . .

And so it becomes a puzzle. And when looking at all of the injuries, the only story that makes sense is [John's]. The only story that explains how injuries are sustained by [Sam's] face in that diagonal motion across his face is that he was struck in the face by an object. And [John] tells his counselor . . . .

[John] was specifically instructed, according to the counselor, by his mother and his grandmother to tell people that it was night terrors. The coverup explains how a 7-year-old knows to report that these injuries were night terrors.

. . . .

. . . You'll see throughout these records that he's concerned. He's crying because he feels guilty about having to tell what [h]is mother did, and he's trying to diminish her responsibility because he feels bad about it.

And [Mother] and [Ann] have put him in that position, and a child shouldn't be placed in that position. They took advantage of his caring and protective nature and asked him to lie for them. . . .

17

Viewed in the light most favorable to the trial court's decision, the entirety of the evidence was legally sufficient to allow a reasonable fact-finder to conclude that Mother's course of conduct violated either subsection (D) or (E) of section 161.001(b)(1). *See, e.g.*, *In re M.M.M.*, Nos. 01-17-00980-CV, 01-17-00981-CV, 2018 WL 1954178, at *10–13 (Tex. App.—Houston [1st Dist.] Apr. 26, 2018, pets. denied) (mem. op.); *In re A.R.M.*, No. 05-17-00539-CV, 2018 WL 1559820, at *9–10 (Tex. App.—Dallas Mar. 20, 2018, pet. denied) (mem. op. on reh'g); *In re R.M.*, No. 07-14-00392-CV, 2015 WL 1244380, at *3–4 (Tex. App.—Amarillo Mar. 18, 2015, no pet.) (mem. op.). The evidence also was factually sufficient because it allowed the trial court to reasonably form a firm conviction or belief that Mother violated one of the alleged endangerment grounds. *See, e.g.*, *M.M.M.*, 2018 WL 1954178, at *10–13; *In re H.C.*, 942 S.W.2d 661, 665–67 (Tex. App.—San Antonio 1997, no pet.). We overrule issue one.

### 3. Best Interest

Mother also argues that the evidence was legally and factually insufficient to support the trial court's conclusion that clear and convincing evidence showed that termination of Mother's parental rights was in John's best interest. A child's best interest is a trial court's "primary consideration" when determining conservatorship, possession, or access to a child. Tex. Fam. Code Ann. § 153.002 (West 2014); *see also id.* § 161.205 (West 2014) (stating if termination not ordered, trial court may either deny the petition or "render any order in the best interest of the child"). There is a

strong presumption that keeping a child with a parent is in the child's best interest. *See In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006). But the emotional and physical interests of the child may not be sacrificed merely to preserve the parent-child relationship. *See In re E.C.R.*, 402 S.W.3d 239, 240 (Tex. 2013); *see also* Tex. Fam. Code Ann. § 263.307(a) (West Supp. 2018) (providing placement of child in safe environment is presumed to be in child's best interest). There are several, nonexclusive factors a trial court may consider in determining a child's best interest, including the emotional and physical needs of the child now and in the future, the parenting abilities of the individuals seeking custody, the plans for the child, the stability of the home or proposed placement, the acts or omissions of the parent indicating that the parent-child relationship is not a proper one, and the desires of the child. *See C.H.*, 89 S.W.3d at 27; *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976); *see also* Tex. Fam. Code Ann. § 263.307(b) (listing factors to be considered in determining whether parent is able to provide child with safe environment).

Mother, Ann, Justin, and John's attorney ad litem testified that termination of Mother's parental rights would not be in John's best interest. Odiachi also testified that John's best interest would be served through a continuing relationship with Mother, but he recognized that John needed a stable home. Howard stated that although she previously was "on the fence" about whether termination was in John's best interest, she would recommend termination because Mother had hit Sam and because she and Ann had coached John to lie about it. Billings testified that Mother's

19

course of conduct led DFPS to conclude that John's best interest would be served by a nonfamily adoption. The guardian ad litem also believed Mother's parental rights should be terminated as in John's best interest.

Again, DFPS summarized the evidence that showed why termination was in John's best interest:

> You know, when you look at the best interest of a child, best interest of the child has got to be the centermost factor of any decision that's made by a court or made by a parent. And in the closing argument of [Mother] and the [attorney] ad litem, who are they putting on the stand as the guilty party? [John]. They are putting him as the responsible party. And if you look under the best interest factors whether the child . . . is fearful of living in or returning to the child's home, those notes talk about retaliation to [John], and they're blaming [John]. What are they going to do - - what is she going to do when [John] - - if you place [John] in that home, what harm will that child suffer? No mother, no mother puts their child on the chopping block and blames them. That woman is not - - does not have his best interest at heart.

The trial court explained that it considered the nonexclusive factors provided by *Holley* and section 263.307 in concluding that the termination of Mother's parental rights was in John's best interest, and its findings and conclusions bear that out.

The evidence showed that John had been traumatized by Mother's relationship with Justin and that Mother continued to have a relationship with Justin. Mother was not open to substance-abuse treatment, and her continued contact with Justin raised concerns because Justin was Mother's trigger for drug use. Mother did not take responsibility for her actions and had poor impulse control. And as found by the trial court and supported by clear and convincing evidence, Mother and Ann coached John

20

to lie and say Sam was hurt because of his night terrors, which traumatized John. Howard testified that John was doing well in foster care and that the goal for John was "[a]doption by a non-relative."

We conclude that all of the evidence, including the entirety of Mother's conduct over the life of the case, was legally and factually sufficient to support the trial court's best-interest finding. *See, e.g.*, *In re S.L.W.*, 529 S.W.3d 601, 613–14 (Tex. App.—Texarkana 2017, pet. denied); *In re M.T.*, 516 S.W.3d 607, 612–15 (Tex. App.—San Antonio 2017, no pet.). We overrule issue two.

### III. CONCLUSION

We recognize, as did the trial court, that Mother complied with many of the ordered services, that DFPS initially believed its case should be closed, and that some of the involved third-parties did not recommend termination of Mother's parental rights. But those facts do not equate to insufficient evidence supporting the trial court's ultimate termination decision. The trial court as a reasonable fact-finder had sufficient evidence, even though some was disputed, upon which to base its decision.

Mother seems to argue that because the evidence was disputed regarding how Sam had been hurt and because some involved parties did not recommend termination of Mother's parental rights, the evidence cannot be found to have been clear and convincing. Again, the trial court is the sole judge of the weight to be given to the evidence and of its credibility. *See In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006); *J.P.B.*, 180 S.W.3d at 573–74. And we must defer to those determinations. *See*

21

*H.R.M.*, 209 S.W.3d at 108; *J.P.B.*, 180 S.W.3d at 573. The evidence, even though disputed, was such that the trial court as the fact-finder could have reasonably formed a firm belief or conviction in the truth of its findings, which is all that a sufficiency review requires.

Accordingly, we overrule Mother's issues and affirm the trial court's order of termination. *See* Tex. R. App. P. 43.2(a).

/s/ Lee Gabriel

Lee Gabriel
Justice

Delivered: November 21, 2018